**In re Independent Counsel Kenneth W. STARR.**

**No. LR–M–97–91.**

United States District Court, E.D. Arkansas, Western Division.

Aug. 1, 1997.

### *MEMORANDUM OPINION*

WILSON, District Judge.

Pending before the eight District Judges of the Eastern District of Arkansas is a second letter-complaint (Mandanici II) by Connecticut lawyer Francis T. Mandanici, alleging various conflicts of interests on the part of Mr. Kenneth W. Starr in his role as Independent Counsel in what is widely known as the Whitewater investigation.

Judge Elsijane T. Roy, Judge Henry Woods, Judge James M. Moody, and I have

determined that we should recuse, for reasons set forth below.

In the Eastern District of Arkansas we have long assigned cases by random selection. It is the belief of the District Judges of the Eastern District that a litigant, or complainant, is entitled to the judge she or he draws by random selection. In this case, the complaint has been made to each judge, but those of us who are recusing believe that the parties involved, the bench and the bar, and the public are entitled to know why we are recusing, because of the importance of the matter before us, and because our recusal may, in effect, amount to a dismissal of the current complaint against the Independent Counsel.

There are a variety of reasons a judge may recuse, but it should be for a good and sufficient reason. When a judge is asked to recuse by a party, if she or he denies the request, the reasons for the recusal must be stated so that an appellate court can review the recusal to determine if there was an abuse of discretion. While the authorities are not as stringent in requiring recusing judges to state their reasons, most courts which have considered the issue have indicated that it is a better practice to set forth the reason for the recusal.

A judge, "may have personal reasons (for a recusal)," but these reasons must be valid. *Demers v. Gerety*, 92 N.M. 749, 595 P.2d 387 (App.1978). Likewise, in *Kurz v. Justices of the Supreme Court of New York, Kings County*, 228 A.D.2d 74, 654 N.Y.S.2d 783 (1997) the Appellate Division of the Supreme Court of New York stated, "A judge who recuses himself or herself should state, on the record, the general reasons for the recusal." And Judges Bright, Gibson (John R.) and Bowman have written that judges should "not disqualify themselves unnecessarily." *Davis v. C.I.R.*, 734 F.2d 1302, 1303 (8th Cir.1984). This is the general rule: "A judge is not required to withdraw from hearing a case upon a mere suggestion that . . . [she or he] . . . is disqualified to sit, and it is *improper for* . . . [the judge] . . . *to do so unless the*

alleged cause of recusation is known by . . . (the judge) . . . to exist or is shown by proof to be true in fact." 48A C.J.S. § 151 at p. 856 (1981) (emphasis supplied).

So that one may understand the issues involved, I borrow, verbatim, from an analysis done by the Honorable G. Thomas Eisele:

## I. Background

On January 31, 1994, the Attorney General of United States appointed Robert B. Fiske, Jr., as independent counsel in the Whitewater investigation. On August 5, 1994, subsequent to the reenactment of the statute governing the appointment of independent counsel, *see* 28 U.S.C. § 591 *et seq.* (West 1997), the Special Division of the United States Court of Appeals for the District of Columbia Circuit charged under that statute with appointing independent counsels ordered the appointment of Mr. Starr.[1] Mr. Starr was to replace Mr. Fiske in the ongoing Whitewater investigation In its order, the Special Division cited as the basis for denying Attorney General Janet Reno's request that Mr. Fiske be appointed the potential appearance of impropriety that could arise from the fact that Mr. Fiske had been appointed by Attorney General Reno, who was appointed by President Clinton, an object of the relevant investigation. *See* Order of August 5, 1994, Appointing Kenneth W. Starr Independent Counsel, *quoted* infra.

Mr. Mandanici's vendetta against conservative forces and his objections to Mr. Starr's involvement in the Whitewater investigation are many and of long standing. News accounts reveal that Mr. Mandanici's father was a Democratic mayor whose administration was targeted by Reagan Administration prosecutors, and four years ago Mr. Mandanici wanted a grand jury to indict Neil Bush, President Bush's son, on twelve counts in connection with the 1988 collapse of Silverado Banking, Savings and Loan Association. Recently, he has urged the Justice Department (and the United States Attorney in this District) to pursue criminal charges against

---

1. "Under 28 U.S.C. § 49 (1994), the Chief Justice appoints three judicial officers to serve two-year terms for this [special] division. . . ." *United States v. Tucker*, 78 F.3d 1313, 1315 n. 1 (8th Cir.1996).

Mr. Starr. Thus, Mr. Mandanici's animus is obvious.

Mr. Mandanici first reacted to the Whitewater investigation in September of 1994, when he unsuccessfully pursued a conflict-of-interests complaint against the Hon. David B. Sentelle, a member of the Special Division which appointed Mr. Starr.[2] In August of 1996, Mr. Mandanici filed a complaint with the Eighth Circuit Court of Appeals, but the court took no action. Apparently, Mr. Mandanici also lodged a complaint with the United States Supreme Court.

In September of 1996, Mr. Mandanici sent his first letter-complaint to the judges of this Court, asking that "the Court disbar, suspend, reprimand, or take other disciplinary action against a member of the Bar of the Court, Kenneth W. Starr, due to his violation of ethical rules concerning conflicts of interest." The Court voted to forward Mr. Mandanici's complaint to the Attorney General for her review in the light of her removal power under 28 U.S.C. § 596. By letter dated September 24, 1996, Chief Judge Reasoner sent the complaint to Attorney General Reno.

By letter date-stamped February 7, 1997, Mr. Michael E. Shaheen, Jr., counsel with the Office of Professional Responsibility of the Department of Justice, responded to Chief Judge Reasoner. Mr. Shaheen wrote that, "[i]n our view, assuming for the purpose of argument that all of the matters raised in those materials are supported by credible evidence, those matters are not of a nature such as would justify the Attorney General's use of her removal power under 28 U.S.C. § 596." Letter from Michael E. Shaheen to Hon. Stephen M. Reasoner dated February 7, 1997, at 1. Mr. Shaheen cited legislative history to the effect that the Attorney General should use her removal power only in "extreme" cases. Id. at 2. Mr. Shaheen did comment, however, that, "[o]f course, independent counsel should refrain, during their tenure, from activities that may be or appear to be partisan." *Id.* With respect to Mr. Starr's involvement with the Resolution Trust Corporation (hereinafter the "RTC"), Mr. Shaheen wrote that

it is true that the materials presented to us on their face indicate that Judge Starr at one time may have suffered a technical conflict of interest. However, those materials also make it clear that no such conflict exists at this point. Consequently, there is no information to support the proposition that such a conflict, if in fact it ever actually existed, substantially impairs Judge Starr's current ability to carry out the duties of his office.

*Id.*[3] Finally, Mr. Shaheen noted that the Department of Justice would take no action. The "Pepperdine–Scaife" issues, *see* infra, were not mentioned in Mr. Mandanici's first letter.

By letter to the Court dated March 11, 1997, Mr. Mandanici renewed his request that the Court refer this matter to counsel for further investigation and the prosecution of a formal complaint. In this second letter-complaint, Mr. Mandanici notes that Mr. Shaheen's conclusion that Mr. Starr's alleged conflicts do not constitute "extreme" misconduct leaves open the question of whether those conflicts establish violations of less demanding standards. Thus, Mr. Mandanici backs off from the idea that Mr. Starr should be removed and suggests that the Court consider "the less serious matters of suspension, probation, reprimand or admonition which do not require the satisfaction of an extreme standard." Mandanici Complaint II at 4. In his March 11, 1997, letter-complaint, Mr. Mandanici emphasizes two principal conflicts on Mr. Starr's part: the alleged conflict between Kirkland & Ellis[4] and the RTC and the alleged conflict involving Mr. Starr's relationships with Richard Mellon Scaife, his businesses, the Scaife Foundation, and Pepperdine University—specifically, that Mr.

---

**2.** The other current members of the Special Division are the Hon. John D. Butzner of the United States Court of Appeals for the Fourth Circuit and the Hon. Peter T. Fay of the United States Court of Appeals for the Eleventh Circuit.

**3.** Mr. Mandanici had alleged that Mr. Starr's law firm was involved in litigation with the RTC at the same time that Mr. Starr himself was called upon to investigate the RTC.

**4.** Mr. Starr is a partner in the Washington, D.C., office of that Chicago-based firm.

Starr is beholden to conservative, anti-Clinton entities which are advancing his career and, *ergo*, that Mr. Starr would have a *personal* and financial motivation and incentive to discredit President and Mrs. Clinton which could conflict with the public interest in the fair, just, and even-handed enforcement of the federal criminal laws. In light of the Justice Department's response regarding the older RTC allegations, the Court no longer finds any reason to address the RTC allegations. The Court has chosen, rather, to focus its interest on the new Pepperdine–Scaife issues.

The Court crossed this uncharted terrain with hesitation and caution. It first inquired of Chief Judge John Garrett Penn of the United States District Court for the District of Columbia how his court was handling Mr. Mandanici's complaint. On April 18, 1997, the Court contacted Attorney General Reno and requested her views and advice *in camera*. On May 2, 1997, it contacted the Special Division which appointed Mr. Starr to inquire whether that Division would "take up, consider, and resolve the issues raised by Mr. Mandanici."

On May 8, 1997, the Court received a response from Judge Sentelle on behalf of the Special Division. Judge Sentelle indicated that the authority of the Special Division is purely statutory and that that Division has only one power—that is, appointment. Thus, the Special Division concluded that it has no jurisdiction to pass upon the allegations leveled by Mr. Mandanici. Judge Sentelle's letter did note, however, that independent counsel may be subject to the disciplinary regimes of the courts before which they practice or of whose bar they are members.

In the light of Judge Sentelle's observations, the Court, on May 20, 1997, contacted Chief Judge Harry T. Edwards of the District of Columbia Circuit Court of Appeals, asking whether his court would consider the conflict-of-interests issues raised by Mr. Mandanici. Chief Judge Edwards responded the next day. In his letter, he stated that his court would not refer a matter to the court's

committee on grievances in the absence of a complaint to that court or alleged misconduct in a proceeding before that court.[5] He also noted that an issue would not be referred if that issue was not connected to his court's operations.

On May 21, 1997, the Court received a letter-response from the Justice Department. In that letter-response, Mr. Shaheen, on behalf of the Justice Department, stated, *inter alia*, that

[w]e do not believe that, apart from the context of removal issues, we properly can address any allegations that Mr. Starr has a conflict of interest. An Independent Counsel is subject to discipline by the Department of Justice only through the statutory removal mechanism.

\*       \*       \*       \*       \*       \*

Given the limited role of the Department of Justice with respect to the supervision of Independent Counsels, we do not believe that we properly can offer a view whether Mr. Mandanici's allegations might warrant further inquiry by your Court. Moreover, because of that very limited role, we conducted only a broad, preliminary inquiry into Mr. Mandanici's allegations. We did not go beyond the face of the allegations. Accordingly, we did not gather any additional facts bearing on the issues before your Court.

Letter dated May 21, 1997, from Michael E. Shaheen, Jr., to Hon. G. Thomas Eisele. The Justice Department was unable to offer any further assistance.

Finally, the Court contacted Chief Judge Penn again to inquire into the status of the matter in the United States District Court for the District of Columbia and to request some indication of what further action, if any, that that court contemplated.

In sum, it now appears that none of the other potentially involved and interested courts feels that it has jurisdiction or an appropriate basis for considering the conflict-of-interests issues which have been brought

---

5. Apparently, Mr. Mandanici has not brought his complaints to the attention of the District of

Columbia Circuit Court of Appeals.

to the Court's attention by Mr. Mandanici, and, as noted above, the Attorney General finds no basis for action by her office.

## II. The Question of Standing

Over the course of the Court's discussion of this issue, Chief Judge Reasoner and Judges Howard and Wright offered the opinion that Mr. Mandanici lacks standing to bring his allegations to the Court's attention. They suggested that Mr. Mandanici is an interloper out to manipulate the Court for his own political purposes and that his efforts constitute a political vendetta. Since Mr. Mandanici has no personal interest in the matters before Mr. Starr, the argument goes, he has no standing to raise the conflict-of-interests issues. Thus, the Court should decline to consider Mr. Mandanici's allegations.[6]

Judges Wilson, Roy, Woods, and I disagree on this standing issue. The majority is of the opinion that standing is not a real issue in this situation. The Court does not consider Mr. Mandanici a party to any action or a person with the ability to submit a motion upon which the Court is duty-bound to act. Rather, the Court regards his "complaint" just as it would regard the statement of a witness or other third party, even if anonymous, who informed the Court of such an alleged conflict in counsel's representation. *See infra* at Parts V and VI (discussing and analyzing Pepperdine–Scaife issues). Of course, "[i]deally, conflict of interest problems should be settled between the attorney and his client," *FDIC v. United States Fire Insurance Co.*, 50 F.3d 1304, 1315 (5th Cir. 1995), and the primary responsibility for resolving conflicts issues falls on the lawyer undertaking the representation. *See* Mod. R. Prof Cond. 1.7, Cmt. However, "[i]n litigation, a court may raise the question when there is reason to infer that the lawyer has neglected the responsibility." *Id.* In this case, Mr. Mandanici's letter-complaint merely provides the reason for the inference, and the Court, therefore, may raise the question.

## III. The Rules of the Court

This Court has adopted the Model Federal Rules of Disciplinary Enforcement. See Local Rules for the Eastern and Western Districts of Arkansas at App–1. Rule IV(B) of those Model Federal Rules provides that "[t]he Code of Professional Responsibility adopted by this Court is the Code of Professional Responsibility adopted by the highest court of the state in which this Court sits." The Arkansas Supreme Court has adopted the Model Rules of Professional Conduct. *See In the Matter of the Arkansas Bar Ass'n: Petition for the Adoption of Model Rules of Professional Conduct*, 287 Ark. 495, 496, 702 S.W.2d 326, 393 (1985). Thus, this Court uses the Model Rules as its code of professional responsibility.

Since the Court is here dealing only with the Pepperdine–Scaife issues, it is of the opinion that two rules—Rules 1.7(b) and 8.4—provide the principal backdrop for analyzing the relevant issues. Rule 1.7(b) provides as follows:

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
>> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>>
>> (2) the client consents after consultation. . . .

Rule 8.4 provides that a lawyer who engages in "conduct that is prejudicial to the administration of justice" has committed misconduct.

Initially, the Court faced a difficult question in resolving what procedure to follow when handling a conflicts issue in such an unusual situation. Mr. Mandanici pointed to a "rather low" standard for the Court to employ when determining whether to open an investigation:

> When misconduct or allegations of misconduct which, if substantiated, would war-

---

6. Chief Judge Reasoner and Judges Howard and Wright are also of the opinion that, if Mr. Mandanici does have standing or if standing is a non-issue, the Court should exercise its discretion to decline to act because (1) Mr. Mandanici lacks personal interest and because (2) the Court should avoid the appearance of assisting Mr. Mandanici in his long-standing political vendetta.

rant discipline on the part of an attorney admitted to practice before this court shall come to the attention of a Judge of this Court, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these Rules, the Judge *shall refer* the matter to counsel for investigation and the prosecution of a formal disciplinary proceeding or the formulation of such other recommendation as may be appropriate.

Mod. Fed. R. Disc. Enf. V(A) (emphasis added). As a matter of statutory interpretation, the Court accepts that the plain language of the Model Federal Rule and a strict, textualist reading of that plain language would require the referral, and Judges Wilson, Roy, and Woods are convinced that Model Federal Rule V(A) creates a mandatory, ministerial, and nondiscretionary duty to refer this matter to counsel for an investigation and report.

Nevertheless, a majority of the judges on the Court—Chief Judge Reasoner, Judges Howard and Wright, and I—believes that the Model Federal Rules permit some discretion in the matter. Despite the apparently mandatory language of Model Federal Rule V(A), the Court did not choose to refer this matter immediately to an outside "counsel" or investigator. Decisions regarding local rules are never truly ministerial, and the Court that created those local rules *should* be able to adapt them to unforeseen circumstances. *See Max M. v. New Trier High School District No. 203,* 859 F.2d 1297, 1300 (7th Cir. 1988), *cited in Morgan Distributing Co., Inc. v. Unidynamic Corp.,* 868 F.2d 992, 996 (8th Cir., 1989). A district court enjoys "considerable leeway in the application of its local rules." *Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 611 n. 2 (8th Cir.1994) (quoting *Silberstein v. I.R.S.,* 16 F.3d 858, 860 (8th Cir.1994) (citing *Morgan Distributing,* 868 F.2d at 996). The circumstances of each situation before the Court should guide the enforcement of those rules. *See Cohen v. Carnival Cruise Lines,* 782 F.2d 923, 924 (11th Cir.1986), *cited in Morgan Distributing,* 868 F.2d at 996.

The Court rejected the textualist position that Rule V is nondiscretionary and mandatory for two reasons: (1) inflexible readings of certain words and phrases in professional rules may lead to unreasonable, unfair, and unwise results when viewed in light of the overall purpose of those rules, and (2) this textualist approach is entirely unprecedented and inconsistent with the Court's common practice since it first adopted the Model Federal Rules at the behest of the Chief Justice and the Judicial Conference in 1980.[7] First of all, federal courts should not inflexibly apply professional rules without considering the important societal rights that are at stake. *See FDIC,* 50 F.3d at 1314. The Court must examine not only the rules in their technical application but also the "less obvious influences on the interest of society in the orderly administration of justice, on the interest of clients in candid consultation and choice of counsel, and on the interest of the legal profession in its reputational soul." *Steele v. Lacey,* 1997 WL 138974 (D.Neb. March 26, 1997) (quoting *State of Arkansas v. Dean Foods Products Co., Inc.,* 605 F.2d 380, 383 (8th Cir.1979), *overruled on other grounds,* In re *Multi–Piece Rim Products Liability Litigation,* 612 F.2d 377 (8th Cir. 1980)). Societal rights at stake include "the right of a party to his counsel of choice and an attorney's right to freely practice her profession." *FDIC,* 50 F.3d at 1314.

Moreover, it is clear that an automatic, mandatory, and entirely nondiscretionary approach to such matters had not been embraced by this Court in the past. Thus, it would have been unprecedented to apply the Model Federal Rule in such a nondiscretionary manner in this instance. If a lawyer were practicing before any judge of the Court and the judge became aware of a possible conflict, the judge would not automatically and immediately refer the possible conflict to an outside individual or committee. Rather, the judge would proceed informally to assess the situation. Thus, the Court felt compelled in this situation not to embrace an unthinking application of a long-unrecognized and rarely used local rule but instead chose to act consistently with past practice and

---

**7.** Indeed, most, if not all, of the judges of this Court have proceeded unaware of Model Federal Rule V until Mr. Mandanici brought it to the Court's attention. .

with sensitivity to the delicate and complex nature of this particular situation.

### IV. The Court's Authority

In *Harlan v. Lewis*, the Eighth Circuit Court of Appeals settled the question of the Court's authority to deal with ethical problems on its own. *See* 982 F.2d 1255 (8th Cir.1993). In that case, Judge Woods proceeded under the Court's inherent power and sanctioned a lawyer for violating Model Rule 3.4(f). *See id.* at 1259. The Eighth Circuit panel which reviewed the decision offered several important observations about the Court's inherent power:

> The existence in the federal courts of an inherent power "necessary to the exercise of all others" is firmly established. *See United States v. Hudson,* 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812). While this inherent power "ought to be exercised with great caution," it includes the power to discipline attorneys appearing before the court. *See Ex parte Burr,* 22 U.S. (9 Wheat.) 529, 531, 6 L.Ed. 152 (1824). Over the years, the Supreme Court has found inherent power to include the ability to dismiss an action, assess attorneys' fees, and to impose monetary or other sanctions appropriate "for conduct which abuses the judicial process." *Chambers* [*v. NASCO, Inc.],* 501 U.S. [32, 44–45] 111 S.Ct. [2123,] 2133, [115 L.Ed.2d 27].

*Id.* The panel held, moreover, that Judge Woods did not err by imposing sanctions rather than referring the violation to the state disciplinary authorities:

> A district judge must have the power to deal with conduct of attorneys without delegating this responsibility to state disciplinary mechanisms. State disciplinary authorities may act in such cases if they choose, but *this does not limit the power or responsibility of the district court* .... Under these circumstances, the district court was correct in resolving both the disciplinary and remedial questions in a single action.

*Id.* at 1261 (emphasis added).

That commentary was in keeping with the Eighth Circuit's earlier pronouncements which encourage district courts to keep their own houses. In 1991, Judge Gibson, writing for a different panel, noted that, "in attorney disqualification issues, ... the district court bears responsibility for supervision of the members of its bar." *Jenkins v. Missouri,* 931 F.2d 470, 484 (8th Cir.1991) (citing *Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602, 605 (8th Cir.1977) (citing in turn *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975)), *cert. denied,* 502 U.S. 967, 112 S.Ct. 437, 116 L.Ed.2d 456 (1991). Judge Gibson noted, moreover, that district courts should "strictly enforce" the Code of Professional Responsibility and that such enforcement would be reversed only upon a finding of abuse of discretion. *See id.*

Indeed, actions by judges dealing with ethical issues are not uncommon. In 1990, for example, the Hon. James Mixon, a bankruptcy judge, made an explicit finding under Model Rule 1.7(b) that an attorney had an "irreconcilable conflict of interest which precluded his representation" of his clients. *In re Thompson,* 116 B.R. 679, 681 (Bkrtcy. W.D.Ark.1990). Judge Mixon did not immediately refer the matter to outside counsel. Rather, he imposed monetary sanctions on the attorney and referred a copy of his opinion to the Arkansas Supreme Court's Committee on Professional Conduct with a request that appropriate action be taken against the attorney. *Id.* at 682. Thus, before taking any action, Judge Mixon made a substantive determination that a conflict existed.

I feel compelled to act similarly. Mr. Starr filed a petition for enrollment to practice in the United States District Courts for the Eastern and Western Districts of Arkansas on April 24, 1995, and he was admitted on April 25, 1995. The Court has noted that it bears the responsibility for supervising members of its bar. *See Jenkins,* 931 F.2d at 484; *Cook v. City of Columbia Heights,* 945 F.Supp. 183, 185 (D.Minn.1996) (citing *Cohen v. Hurley,* 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156 (1961)). The Court's inherent power to "supervise the conduct of attorneys who are admitted to practice before it, or admitted for the purpose of a particular proceeding (pro hac vice)," gives rise to that responsibility. Local Rules for the Eastern

and Western Districts of Arkansas at App–1. Model Federal Rule VIII specifically provides that attorneys admitted *pro hac vice* "shall be deemed thereby to have conferred disciplinary jurisdiction upon this Court for any alleged misconduct of that attorney arising in the course *of or in the preparation for* such proceeding." (Emphasis added.) Thus, by virtue of his requesting admission *pro hac vice*, Mr. Starr has consented to abide by the disciplinary regime of the Court.

Moreover, Supreme Court precedent and legislative history support that conclusion. The Supreme Court has recognized the Court's inherent power to control admission to its bar and to discipline attorneys who appear before it. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991). In reenacting the independent-counsel law, Congress, too, assumed that district courts could hold the Independent Counsel accountable for ethical violations: "[Independent Counsel] are accountable to the appointing court, which defines their jurisdiction, and, like other prosecutors, *they are subject to the authority of trial and appellate judges*." 139 Cong. Rec. § 15,846–01 (Nov. 17, 1993) (statement of Sen. Cohen) (emphasis added). As Mr. Starr currently appears in litigation before this Court and is using grand juries created by this Court, I have concluded that the Court enjoys the power-inherent, under the law providing for the appointment of independent counsel, and under the Court's own rules-to deal substantively with the conflicts at issue here.[8]

I have not been unmindful of the fact that the issues we have considered have arisen outside the narrow context of any particular case or trial but in the more diffuse context of an ongoing grand-jury investigation. Moreover, I acknowledge that the alleged conflicts tend more directly to implicate Mr. Starr's investigation of President and Mrs. Clinton than they do to implicate his litiga-

tion of the other Whitewater matters. Thus, I have considered whether the Court would overstep its bounds by dealing with conflicts issues that did not arise in a particular case or proceeding in this Court. I have concluded, however, that all of the Whitewater litigation is woven inextricably with Mr. Starr's investigation of President and Mrs. Clinton, and it is reasonable to conclude that all Whitewater litigation directly or indirectly affects President and Mrs. Clinton. Thus, I have rejected efforts to characterize the alleged conflicts as separate from and independent of the litigation actually pending before this Court, and certainly those conflicts cannot be disassociated from the Independent Counsel's ongoing grand-jury work in this District.

I have also considered whether the Court would trench on the function of the Executive Branch or the grand jury by acting in any way at all which might disturb Mr. Starr's investigation. In that vein, I note the Supreme Court's decision in *United States v. Williams*, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). In *Williams*, the district court dismissed an indictment because the Government failed to disclose certain exculpatory evidence to the grand jury. The Tenth Circuit Court of Appeals affirmed, and the Supreme Court, in an opinion by Justice Scalia, reversed. · The Court rejected the argument that the district court's inherent power encompassed the authority to dismiss the indictment, noting that such a power has been recognized by the Supreme Court when district court's assert their "power to control their *own* procedures." *Id.* at 45, 112 S.Ct. at 1741 (emphasis in original). The Court indicated that, indeed, the district court could have dismissed the indictment pursuant to its supervisory power where the misconduct violated a clear rule drafted by the Supreme Court and Congress to ensure the integrity of grand-jury functions. The Court declared,

---

**8.** If the Court does not have this power and authority, then apparently no court and no Executive–Branch agency or legislative body will be able to deal with these conflicts issues *before the harm contemplated occurs—i.e.*, before the biased (here assumed) exercise of the Independent Counsel's prosecutorial discretion. After the Independent Counsel obtains from the grand jury

and signs an indictment, the defendant named therein may never be able to raise the issue that he would not have been indicted had the Independent Counsel fairly and even-handedly exercised his prosecutorial discretion. Therefore, unless such ethical standards may be timely enforced, they could become, in cases such as this, a nullity.

however, that a district court could not use its supervisory power "as a means of *prescribing* those standards of prosecutorial conduct in the first instance—just as it may be used as a means of establishing standards of prosecutorial conduct before the courts themselves." *Id.* at 46–47, 112 S.Ct. at 1742. The Court noted that the district court and the grand jury are separate institutions and that the district court does not preside over the functioning of the grand jury.

I am respectful of the independent nature of the grand jury but have concluded that *Williams* does not apply in this situation. *Williams* deals exclusively with the Court's lack of power to prescribe grand jury procedures. This case does not involve the procedures Mr. Starr uses before the grand jury. Rather, the Court is dealing with allegations of conflicts of interests in violation of the rules of professional responsibility adopted by this Court and in violation of the spirit of the Ethics in Government Act. *See generally* Beth Nolan, *Removing Conflicts from the Administration of Justice. Conflicts of Interest and Independent Counsels Under the Ethics in Government Act,* 79 Geo.L.J. 1 (1990) (hereinafter "Nolan, *Removing Conflicts* ").

My intention is that the Court will treat Mr. Starr no differently than it would treat a United States Attorney or Assistant United States Attorney in a similar situation. If a United States Attorney were investigating possible criminal antitrust violations involving three milk producers and a fourth milk producer, a competitor of the three companies under investigation (which, by assumption, would benefit if indictments were returned), agreed to employ the United States

Attorney in the future as its in-house counsel at a handsome stipulated figure after the United States Attorney completes her term or completes the antitrust investigation, then that arrangement would, I submit, clearly create both an actual and an apparent conflict of interests. Would not this conflict, if brought to the Court's attention (by whatever means—*i.e.,* even if anonymously or with a mean-spirited, personal animus against the United States Attorney), require the United States Attorney's complete disqualification from the antitrust investigation? It is my opinion that the Court would have not only the authority to act [9] but also the duty to do so if the allegations as set forth in this hypothetical were true. Similarly, this Court has the authority and duty to address the allegations against Mr. Starr.

Certain authority suggests that courts may exercise their supervisory power in a case such as this only in the face of a constitutional or statutory violation. *See United States v. Simpson,* 927 F.2d 1088, 1090 (9th Cir. 1991).[10] The Court has not, at this point, exercised any supervisory power. Before determining whether the Court should exercise its supervisory power, the Court needs to be informed whether the conflicts alleged actually exist and whether an exercise of the Court's supervisory power would be appropriate.[11]

## V. The Substantive Allegations

Although Mr. Mandanici raises a number of conflict-of-interests issues in his complaint, the Court has primarily been concerned with the conflicts revolving around Mr. Starr's relationship with Pepperdine University and Mr. Scaife for the following reasons. First of all, that alleged conflict first became public

9. There are separation-of-powers problems involved that could affect the nature and the extent of the Court's action in response to such a factual scenario. It is my tentative view that the Court could order the disqualification of the offending United States Attorney. In any event, if the United States Attorney refused to step aside upon the suggestion of the Court, the matter could be referred to the Attorney General, who would surely order her disqualification under existing Executive–Branch ethical rules and procedures.

10. The Court also notes the concurring opinion by Judge Nelson in the *Simpson* case. Judge Nelson wrote separately to emphasize that courts

could, in certain situations, properly exercise their supervisory powers absent a constitutional or statutory violation. *See Simpson,* 927 F.2d at 1091–92 (Nelson, J., concurring).

11. Although such an observation may be premature, the Court notes that due process of law may well demand prosecutorial impartiality. *See Young v. United States* ex rel. *Vuitton et Fils,* 481 U.S. 787, 815, 107 S.Ct. 2124, 2141–42, 95 L.Ed.2d 740 (1987) (Blackmun, J., concurring); *Bordenkircher v. Hayes,* 434 U.S. 357, 365, 98 S.Ct. 663, 669, 54 L.Ed.2d 604 (1978).

(so far as this Court knows) in the spring of 1997, and it was not considered by Attorney General Reno when the Court forwarded Mr. Mandanici's first letter-complaint to her office. Second, I am of the opinion that the Pepperdine allegations suggest the type of conflict that is not waivable in that they concern not a particular conflicted client but the integrity of prosecutorial decisionmaking in which every inhabitant of this land has a vital interest.

Near the beginning of its consideration of these issues, I noted that the Fifth Circuit Court of Appeals has considered the following factors in evaluating conflicts:

"whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case."

*FDIC,* 50 F.3d at 1314 (quoting *In re Dresser Industries, Inc.,* 972 F.2d 540, 544 (5th Cir. 1992)). In this case, it is clear that the appearance of impropriety, regardless of the reality of any conflict, could—if it has not already—invade the public perception. That conclusion is obvious from the media accounts noted by Mr. Mandanici. In controlling precedent, the Eighth Circuit Court of Appeals has recognized the power of print media to affect public perception. *See Tucker,* 78 F.3d at 1322–23 (accepting reliance on newspaper articles to find appearance of impartiality and thereby to justify disqualifying district judge). Indeed, the Eighth Circuit Court of Appeals has made clear that the Court may take judicial notice of such news accounts. *See id.* at 1325. Thus, having reviewed the media accounts regarding the Pepperdine issue, I find that it is incumbent upon the Court to make some kind of inquiry.

I have reviewed in their entirety Mr. Mandanici's submissions and have focused primarily on the following sources: the February 20, 1997, *Arkansas Democrat–Gazette;* the February 23, 1997, *Philadelphia Inquirer;* the March 10, 1997, *Time Magazine;* and the February 26, 1997, *New York Times.* If one accepts as true the reports contained in

these publications, it appears that, in 1991 and 1993, Mr. Starr spent his summer teaching at Pepperdine University in Malibu, California. Brad Cheves, Pepperdine's assistant dean, stated that Mr. Starr was intimately involved in the project to establish a school of public policy at Pepperdine. According to John Secia, a spokesperson for the school of public policy, the school was founded, in part, to serve as a philosophical counterpoint to the generally liberal Kennedy School of Government at Harvard University.

According to Mr. Cheves, the Scaife Foundation was one of three foundations that helped underwrite the nine million dollars raised to start Pepperdine's school of public policy. The Scaife Foundation made at least one contribution of $250,000 in 1993 to establish a public-policy chair at Pepperdine. David Davenport, Pepperdine's president, stated in February of 1997 that the Scaife Foundation had given 1.1 million dollars toward the 2.75 million dollars in start-up costs for the school of public policy.

The chairman of the Scaife Foundation is Richard Mellon Scaife, a western Pennsylvania newspaper publisher who, according to various media reports, has used his fortune to press a media campaign discrediting President Clinton and suggesting that Vincent Foster, Jr., may have been murdered. Mr. Scaife serves on Pepperdine's board of trustees. The Scaife Foundation has supported a number of conservative entities, including Accuracy in Media, the Western Journalism Center, the National Taxpayers Union, and the *American Spectator.* Some or all of these groups have offered commentary on the Whitewater controversy and the death of Vince Foster, which commentary was critical of President and Mrs. Clinton.

In the spring of 1997, Mr. Starr announced that he would leave the Independent Counsel's office in August of this year to become dean of the law school and the school of public policy at Pepperdine. Jeff Bliss, a Pepperdine spokesperson, indicated that Mr. Scaife did not know of Mr. Starr's appointment as dean beforehand. He stated that "[t]he Scaife gifts and the Starr appointment have nothing to do with each other." At a news conference, Mr. Starr noted that he

was aware that the Scaife Foundation had made a start-up grant to the school of public policy at Pepperdine. He said, on the other hand, that the Scaife Foundation has been funding organizations that have been critical of his office for not producing more criminal charges than it has.

Mr. Starr then abandoned his plan to assume his duties at Pepperdine as scheduled. President Davenport indicated that Pepperdine would give Mr. Starr "an open-ended time frame." These circumstances are apparently the basis for the words of Washington Diary columnist Margaret Carlson: "Starr is now beholden to Pepperdine to hold open a job, for which it is partly beholden to benefactor Scaife." Thus is the alleged conflict brought to the Court's attention by Mr. Mandanici.

## VI. Analysis

Although the Court would need more factual information to conclude that an actual conflict of interests exists, it is difficult to argue that Mr. Starr is not laboring under at least an appearance of conflict.[12] The problem appears to be somewhat akin to the old "revolving door" problem: some individuals employed by governmental regulatory agencies would, in the middle of their government service, accept prospective job offers with the private companies which they regulated—such employment to begin immediately upon their resignation from the government positions. The conflict in those situations is obvious, and well publicized efforts have been made to ameliorate the problem. In the situation before the Court, Mr. Scaife, said to be a bitter opponent of President and Mrs. Clinton, especially with respect to Whitewater-related issues, has apparently helped to arrange and make possible the very career opportunities that Mr. Starr wants to pursue as soon as he completes his work as Independent Counsel. It appears that Mr. Starr may be involved in a third-party conflict of interest—that is, "the independent counsel ... has an obligation to a non-client third party that could compromise the independent counsel's neutrality in a matter under investigation." Nolan, *Removing Conflicts* at 23.

Even if not true in fact, there is the inevitable appearance that Mr. Starr may consciously or subconsciously tailor his prosecutorial decisions to please his benefactor. Mr. Starr, in response to such suggestions, notes that Mr. Scaife's beneficiaries have actually criticized him for not producing more criminal charges. However, merely keeping open certain investigations—such as the investigation into Vince Foster's death—for a lengthy period of time might suggest improper influences, even if Mr. Starr ultimately concludes that nothing improper occurred whatsoever. And, of course, it would also be wrong for Mr. Starr in exercising his official responsibilities to "bend over backward" to avoid any claim that he was being influenced by Mr. Scaife's views. It is clear to me that complete independence from such extraneous influences is necessary to maximize the public acceptance of the prosecutor's actual exercise of his official prosecutorial discretion. "This concern with 'even the appearance of impropriety' is a theme that permeates post-Watergate ethics legislation." Nolan, *Removing Conflicts* at 33. Thus, this Court is obligated to deal with the alleged conflict.

A higher degree of ethical sensitivity than that which drives a private attorney should compel Mr. Starr in his role as Independent Counsel. "[A prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Young*, 481 U.S. at 803, 107 S.Ct. at 2135. "Prosecution of criminal offenses is a paradigm of a function that should be

12. Although the Model Rules does not contain the Model Code's appearance-of-impropriety standard, the Arkansas Supreme Court has interpreted that standard to permeate and animate the Rules. This Court agrees with the Arkansas Supreme Court that the standard is implicit in the Model Rules; however, the Court is of the opinion that, in a case such as this, even if the standard were not part of the Model Rules, the Court could act under its inherent power. More importantly, the independent-counsel law itself mandates that the Independent Counsel not suffer from even an appearance of a conflict of interests. *See* Order of August 5, 1994, Appointing Kenneth W. Starr Independent Counsel, *quoted* infra.

protected from political and other nonneutral interests. In fact, its neutrality is not merely a governmental aspiration; it is a constitutional requirement. The goal of the independent counsel law is to '[r]emov[e] politics from the administration of justice.'" Nolan, *Removing Conflicts* at 4.

It is even possible that Mr. Starr, as Independent Counsel, should receive more exacting scrutiny regarding his professional responsibilities than other prosecutors. *See id.* at 35. Indeed, the Special Division which elected not to appoint Mr. Fiske as Independent Counsel—but which instead appointed Mr. Starr—made the following observations:

> The court, having reviewed the motion of the Attorney General that Robert B. Fiske, Jr., be appointed as Independent Counsel, has determined that this would not be consistent with the purposes of the Act. This reflects no conclusion on the part of the court that Fiske lacks either the actual independence or any other attribute necessary to the conclusion of the investigation. Rather the court reaches this conclusion because the Act contemplates an apparent as well as an actual independence on the part of the Counsel. As the Senate Report accompanying the 1982 enactments reflected, "[t]he intent of the special prosecutor provisions is not to impugn the integrity of the Attorney General or the Department of Justice. Throughout our system of justice, safeguards exist against actual or *perceived* conflicts of interest without reflecting adversely on the parties who are subject to conflicts." S.Rep. No. 496, 97th Cong.2d Sess. at 6 (1982) (emphasis added). Just so here. It is not our intent to impugn the integrity of the Attorney's General's appointee, but rather to reflect the intent of the Act that the actor be protected against perceptions of conflict. As Fiske was appointed by the incumbent administration, the court therefore deems it in the best interest of the appearance of independence contemplated by the Act that a person not affiliated with the incumbent administration be appointed.

Order of August 5, 1994, appointing Kenneth W. Starr Independent Counsel. Although

the Ethics in Government Act intended to remedy the problems inherent in the Executive Branch's investigating its own officials, conflicts such as those alleged here may be equally disabling to an Independent Counsel. Indeed, Professor Beth Nolan of George Washington University's National Law Center has noted that "[t]he goal of the Act is to replace Justice Department officials tainted by a potential conflict of interest in a specific case with individuals who have no disabling relationship with the President, the Attorney General, the Department of Justice, or the targets of the investigations." Nolan, *Removing Conflicts* at 9. Thus, the independent-counsel law furthers the aspiration that this nation live under "a government of laws and not of men." *Id.* at 3 (citing *Morrison v. Olson,* 487 U.S. 654, 697, 108 S.Ct. 2597, 2622, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting)).

(END OF QUOTE BY JUDGE EISELE)

Despite the above analysis, Judge Eisele is of the opinion that this matter should be referred to counsel for investigation only if a majority of "the court," that is, a majority of the eight district judges of the Eastern District of Arkansas, concur. Chief Judge Stephen M. Reasoner, Judge George Howard and Judge Susan Webber Wright dissent from Judge Eisele's analysis and conclusions, and are of the opinion that no referral should be made.

Judge Moody recused immediately from the consideration of Mandanici II because, at the time we received the complaint, the Independent Counsel's office was still investigating the facts and circumstances surrounding the death of the late Vincent W. Foster, Jr. Judge Moody is married to Mr. Foster's widow.

To put our recusal discussion in immediate context, I again quote from the applicable Model Federal Rules of Disciplinary Enforcement, paragraph V(A):

> When misconduct or allegations of misconduct which, if substantiated, would warrant discipline on the part of an attorney admitted to practice before this court shall come to the attention of a Judge of this Court, whether by complaint or otherwise,

and the applicable procedure is not otherwise mandated by these Rules, the Judge *shall refer* the matter to counsel for investigation and the prosecution of a formal disciplinary proceeding or the formulation of such other recommendation as may be appropriate. (Emphasis supplied)

These model rules have been adopted by the Eastern and Western District of Arkansas, and by many federal jurisdictions across the country.

Judge Elsijane T. Roy,[13] Judge Henry Woods and I initially were of the opinion that referral is a ministerial, nondiscretionary matter, and that, therefore, we could properly join in a vote to refer the complaint to counsel for investigation.[14] Judge Eisele has made a forceful argument that, despite the use of the word "shall" in the rules, it is still a discretionary matter. If this is correct, then Judges Roy, Woods and I have decided to recuse. We are friends of the Clintons, and they are the targets of the Independent Counsel (*United States v. Robert Fiske, Jr.,* 968 F.Supp. 433).

In considering Judge Eisele's analysis of precedents involving the "discretion" of a district judge dealing with ethical matters, it is important to note that the exact wording of our disciplinary rules (including the Model Rule, cited above) had not been drawn into sharp focus until about a year ago. Judge Eisele argues that, "It would have been unprecedented to apply the Model Federal Rule in such a nondiscretionary manner in this instance." (See page 1149, *supra*). Judge Eisele cites several authorities for his position, including the case of *Harlan v. Lewis,* 982 F.2d 1255 (8th Cir.1993) in which the Eighth Circuit approved an Eastern District Judge's discretion when he imposed a sanction outside the context of our local rules pertaining to ethical matters. As just noted, however, this was before the judges of this district had specifically concentrated on the Model Federal Rules. Approximately a year ago, when this question was first addressed "as a court", we decided, by a 7–1 vote, that the disciplinary rule, cited above, calls for

ministerial, nondiscretionary, action. The question we faced at that time was whether the judges of the Eastern District should recuse after a referral to investigating counsel—when the investigating counsel sends the case back for action by the Court.

Shortly thereafter, we were called upon to consider another section of these same model rules which also uses the word "shall." In that case (a Whitewater case) we voted *unanimously* that "shall" means "shall", and that, therefore, we were left no discretion whatsoever. In that case we removed a lawyer's name from the role of lawyers permitted to practice in the Eastern District of Arkansas because he had been convicted of a felony. There was some thought, by some judges, that we should await the results of an appeal. But, after considerable discussion and debate, each of us voted that we had no discretion.

There is additional authority which would support a decision not to recuse. After we (the eight District Judges of the Eastern District of Arkansas) voted to refer the first Mandanici complaint (Mandanici I) to the Attorney General, Judge Woods' authority to vote on that referral was challenged because the Eighth Circuit had previously removed him from a Whitewater case (see *United States v. Tucker,* 78 F.3d 1313, 1315 n. 1 (8th Cir.1996). In rejecting the challenge to Judge Woods' participation the Judicial Council of the Eighth Circuit, on April 11, 1997 ruled:

> ... [Judge Woods] was not required to recuse himself from participating in the judges' meeting in which they voted on where to send the attorney complaint.

After considerable research and reflection, we (Judges Roy, Woods and I) have concluded that the better rule is that the court, or any judge of the court, should be permitted reasonable discretion in determining whether to refer a complaint to counsel for investigation. When we reached this conclusion, we decided to recuse. Arguably, under authority of the Judicial Council opinion, quoted

---

**13.** From the outset Judge Roy has recused in Whitewater cases.

**14.** For that matter, any one judge, according to the language of our Disciplinary Rules, "shall" refer any complaint.

immediately above, we could still refer to counsel for investigation, but we believe that we should not under these circumstances (I note parenthetically, too, that the district judges of the Eastern District who were foes of the Clintons during their Arkansas days are not recusing. Since recusal is up to each individual judge I will not presume to second-guess their decision; they apparently see a distinction in our respective situations).

This means, of course, that there is no majority of the judges of the Eastern District of Arkansas—which Judge Eisele deems necessary—to refer the Mandanici II complaint to counsel for investigation.

## CONCLUSION

Judge Eisele has contacted other courts which would appear to have authority over Mandanici II, but each of these courts has declined to assume jurisdiction. As noted in Judge Eisele's analysis, *supra*, the Attorney General of the United States and the Justice Department have repeatedly declined to assume jurisdiction of Mandanici I and Mandanici II. With admirable persistence, Judge Eisele has yet again requested that the Justice Department assume jurisdiction to determine whether Mandanici II should be investigated and, if investigated, what course of action should be taken.[15] Thus far the Justice Department has not responded, but may do so. If the Justice Department reverses its position, and assumes jurisdiction over the Mandanici complaint, this opinion should have no effect on that decision or investigation.

Those of us who are recusing do not do so lightly. We do this realizing that this probably has the effect of killing the Mandanici II complaint without it having been considered on the merits. In fact, it is hard to escape the conclusion that our recusal may well confer defacto immunity on the Independent Counsel, with respect to ethical violation complaints.

In fine, I am filing this opinion because I think it is important for the complainant, the party complained against, the bench and bar, and the public to know that issues raised by Mr. Mandanici have been extensively researched and debated by the judges of the Eastern District. Further it should be known that Judge Eisele has performed a separate critical analysis of these issues and he reaches conclusions that speak for themselves.

---

**15.** I note, also, that from the outset, i.e., from the filing of Mandanici I, I have been of the opinion that it would be better to refer complaints against Independent Counsel to someone outside of the Eastern District of Arkansas (my first nominee was the Honorable H. Franklin Waters of the Western District of Arkansas, but a motion to accomplish this was defeated 4–4).