In re Francis T. MANDANICI

v.

Kenneth W. STARR.

No. 99–MC–160.

United States District Court,
E.D. Arkansas,
Western Division.

May 18, 2000.

Francis T Mandanici, Bridgeport, CT, plaintiff pro se.

Robert W. Ray, U.S. Department of Justice, Office of the Independent Counsel, Washington, DC, for Kenneth W Starr, defendant.

## ORDER

NANGLE, District Judge.

Pursuant to 28 U.S.C. § 292(b), Chief Judge Roger L. Wollman, of the United States Court of Appeals for the Eighth Circuit, designated this writer to handle the within matter. That designation was necessitated by the action of all of the judges of the Eastern District of Arkansas in recusing themselves. *See* Order dated Dec. 28, 1999 (Doc. 1). The matter before the Court is a June 4, 1999 letter grievance filed by Francis T. Mandanici (hereinafter "Mandanici IV").[1] This Court will now proceed.

---

1. Both the Eighth Circuit and the district court have previously referred to Mandanici's September 11, 1996 letter grievance as "Mandanici I" and his March 11, 1997 letter grievance as "Mandanici II." *See Starr v. Mandanici,* 152 F.3d 741, 742–43 (8th Cir.1998); *In re Starr,* 986 F.Supp. 1159, 1160 (E.D.Ark.1997). The district court previously referred to Mandanici's June 19, 1997 letter grievance as "Mandanici III." *In re Starr,* 986 F.Supp. at

1160. Accordingly, for purposes of clarity, this Court will call Mandanici's June 4, 1999 letter grievance "Mandanici IV," although it appears that Mandanici has actively pursued Starr in other forums as well, including an attempt to secure the attention of the United States Supreme Court. In Mandanici IV, Mandanici admits that he submitted a grievance to the United States Supreme Court regarding his allegation that Dash's resignation

Pursuant to Rule V(A) of the Model Federal Rules of Disciplinary Enforcement and Rule 8.3 of the Arkansas Rules of Professional Conduct,[2] Mandanici asks the Court to commence grievance proceedings against Kenneth W. Starr. Mandanici IV at 1, 6. Specifically, Mandanici asks the Court to appoint counsel to investigate several different allegations of prosecutorial misconduct by Starr and members of the Office of Independent Counsel (hereinafter "OIC"). *Id.* at 1–2. After considering all applicable law and the arguments of the parties, this Court has determined that it has the authority and the duty to evaluate the evidence before it prior to referral to counsel for investigation. Having performed a review and evaluation of the controlling legal authorities and of all of the allegations and other material filed by grievant Mandanici, this Court, acting within its discretion, denies Mandanici's request for appointment of counsel for the reasons set forth in this opinion.

Having considered Mandanici's allegations on the merits and exercised its discretion to deny Mandanici's request that counsel be appointed to investigate his grievances against Starr and the OIC, this Court is under no duty to explain its reasoning. However, because similar complaints have been filed by Mandanici and others in multiple jurisdictions, this Court will set forth its full analysis so that Mandanici, other complainants and future courts in which similar charges may be filed will know that these matters have been fully considered on the merits and denied.

## BACKGROUND OF PREVIOUS GRIEVANCES

The letter grievance at issue stems from ongoing efforts by Francis T. Mandanici to persuade the judges of the Eastern District of Arkansas to sanction Kenneth Starr and the OIC for alleged prosecutorial misconduct in several different matters related to the investigation and subsequent impeachment of President Clinton. In a letter dated September 11, 1996 (hereinafter "Mandanici I"), Mandanici addressed an "ethics grievance" to the District Judges of the United States District Court for the Eastern District of Arkansas, complaining that Starr violated "ethical rules concerning conflicts of interest during the course of what is widely known as the Whitewater investigation." *Starr v. Mandanici,* 152 F.3d 741, 742–43 (8th Cir. 1998). In Mandanici I, Mandanici requested that the judges refer the matters "to counsel for investigation and the prosecution of a formal disciplinary proceeding," pursuant to Rule V(A) of the Model Federal Rules of Disciplinary Enforcement. Mandanici also sought disbarment, suspension, reprimand or other sanctions against Starr. *Id.* at 743.

The district judges referred the matter to the Attorney General, pursuant to 28 U.S.C. § 596.[3] On February 7, 1997, Mi-

as Starr's ethical advisor suggests that Starr violated the Independent Counsel Act. Mandanici IV at 24. As is further admitted, the Supreme Court responded to Mandanici's April 7, 1999 request by stating that "this Court does not impose discipline on an attorney unless a state has done so." Mandanici IV at App. 73a (April 20, 1999 letter from William K. Suter, Clerk of Court, United States Supreme Court to Francis T. Mandanici). This response further suggests that Mandanici also requested action by the Supreme Court at an even earlier date. *Id.* ("As Chief Deputy Clerk Francis J. Lorson explained to you in his letter of August 28, 1998, ...."). For a detailed background of Mandanici's extensive history of filing ethical complaints against Starr and other individuals, see Judge

Eisele's opinion in *In re Starr,* No. LR–M–97–91, slip. op. at 2–3 (E.D.Ark. May 30, 1997).

**2.** Under Rule 8.3, "[A] lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall *inform* the appropriate professional authority." Ark. R.Prof.Cond. 8.3.

**3.** Pursuant to 28 U.S.C. § 596, the Attorney General has the power to remove an Independent Counsel:

 (a) Removal; report on removal.—

 (1) Grounds for removal.—An independent counsel appointed under this chapter may

chael E. Shaheen, Jr., counsel with the Office of Professional Responsibility of the Department of Justice (hereinafter "DOJ"), responded to the judges' referral and explained that the DOJ would take no action on the grievance. Shaheen stated that the "'materials that have been presented ... do not contain allegations of any conduct by [ ] Starr that can be viewed as so 'extreme' as to call for the Attorney General's use of the extraordinary power of removal.'" *Id.* at 743 (quoting from Michael E. Shaheen, Jr.'s letter to then Chief Judge Reasoner of Feb. 7, 1997) (alteration in original). Shaheen did concede, however, that "Judge Starr at one time may have suffered a technical conflict of interest" with respect to his investigation of the Resolution Trust Corporation (hereinafter "RTC").[4] Shaheen stated, however, that it is "clear that no such conflict exists at this point." *In re Starr,* No. LR–M–97–91, slip. op. at 3 (E.D.Ark. May 30, 1997) (hereinafter "May 30, 1997 Mem.Op.").

In a letter dated March 11, 1997 (hereinafter "Mandanici II"), Mandanici amended his grievance to the district court. In Mandanici II, Mandanici reiterated his allegations that Starr suffered a conflict of interest with regard to the RTC. Mandanici further alleged that Starr was laboring under a conflict of interest as a result of Starr's announcement that he planned to accept a deanship at the School of Public Policy ("SPP") at Pepperdine University. Mandanici contended that the SPP received a substantial endowment from Richard Mellon Scaife, a reported long-time opponent of President Clinton and alleged contributor in the efforts to implicate Clinton in the Whitewater scandal as well as in other scandals. *Starr v. Mandanici,* 152 F.3d at 743. In Mandanici II, Mandanici

argued that the Court could employ lesser sanctions against Starr, even if his alleged misconduct did not mandate removal from his position. May 30, 1997 Mem.Op. at 4.

In deciding whether to consider Mandanici's grievances, the judges of the Eastern District of Arkansas "crossed this uncharted terrain with hesitation and caution." *Id.* at 5. The Court sought advice from Judge John Garrett Penn of the United States District Court for the District of Columbia, as well as from Attorney General Reno and the Special Division that appointed Starr. On May 8, 1997, Judge Sentelle responded to the Court on behalf of the Special Division. Judge Sentelle explained that the Special Division only had the authority to appoint the Independent Counsel and had no authority to rule on allegations of Starr's possible ethical violations. Judge Sentelle noted, however, that an Independent Counsel could be subject to sanction by the courts before which he practices or of whose bar he is a member if the Independent Counsel engages in ethical violations. *Id.*

The judges of the Eastern District of Arkansas then requested the opinion of Chief Judge Harry T. Edwards of the District of Columbia Circuit Court of Appeals on his possible consideration of Mr. Mandanici's allegations. Chief Judge Edwards stated that his Court would require either a complaint to the court or alleged misconduct in a proceeding before the court before it would refer a matter to the court's committee on grievances. *Id.* at 5–6. On May 21, 1997, Shaheen of the DOJ responded to the judges' inquiry. Shaheen explained that "'[a]n Independent Counsel is subject to discipline by the Department of Justice only through the statutory removal mechanism.'" However, the

be removed from office, other than by impeachment and conviction, only by the personal action of the Attorney General and only for good cause, physical and mental disability (if not prohibited by law protecting persons from discrimination on the basis of such a disability), or any other

condition that substantially impairs the performance of such independent counsel's duties.
28 U.S.C. § 596(a).

4. *See infra* for a complete discussion and analysis of the RTC allegation.

DOJ declined to " 'offer a view of whether Mr. Mandanici's allegations might warrant further inquiry by [the] Court.' " *Id.* at 6 (quoting letter dated May 21, 1997, from Michael E. Shaheen, Jr. to Hon. G. Thomas Eisele).

After these efforts, Judge Eisele issued a Memorandum Opinion and Order on *Mandanici I* and *Mandanici II* on May 30, 1997. In that opinion, Judge Eisele concluded that "none of the other potentially involved and interested courts feels that it has jurisdiction or an appropriate basis for considering the conflict-of-interests issues which have been brought to the Court's attention by Mr. Mandanici, and, as noted above, the Attorney General finds no basis for action by her office." *Id.* at 6. Judge Eisele addressed several different issues in this opinion, including Mandanici's possible standing, the Court's authority to hear the grievance, the interpretation of Rule V(A) and the merits of Mandanici's allegations.

On August 1, 1997, the district court filed its first published opinion in this matter. *In re Starr*, 986 F.Supp. 1144 (E.D.Ark.1997) (hereinafter "*Starr I*"). In that opinion, Judges Roy, Woods and Wilson recused themselves from considering Mandanici's grievances, stating that they were "friends of the Clintons [who are] the targets of the Independent Counsel."[5] *Id.* at 1156. Those judges chose to recuse after determining that the decision to appoint counsel under Rule V(A) was discretionary, rather than ministerial. *Id.* at 1156–57.

On October 2, 1997, the judges of the Eastern District of Arkansas dismissed Mandanici's grievances. *In re Starr*, 986 F.Supp. 1159 (E.D.Ark.1997) (hereinafter "*Starr II*"). Judge Wright[6] explained that "a majority of the judges in the Eastern District of Arkansas have concluded that the determination of whether to open an investigation of an attorney based on allegations of misconduct is not a ministerial act mandated by our rules but is a matter of discretion." *Id.* at 1160. Further, the Court stated that it was "unaware that Mr. Starr has ever acted in an improper or unethical manner in the matters over which this Court has presided [and][i]n the absence of specific evidence of misconduct . . ., this Court declines the opportunity to provide Mr. Mandanici a forum for the pursuit of his 'vendetta.' " *Id.*

The Court explained that the DOJ "reviewed the precise allegations set forth in *Mandanici II*" and declined to sanction Starr. *Id.* The Court, however, acknowledged that the DOJ's control over Starr is limited to "the Attorney General's power of removal in appropriate circumstances," *id.*, which is a higher threshold than that needed by the Court to impose lesser sanctions. Nevertheless, the Court still emphasized that the Attorney General "determined that the RTC matter does not support the proposition that such a conflict substantially impairs Mr. Starr's current ability to carry out the duties of his office and that there is no evidence with respect to the Pepperdine University matter that would suggest Mr. Starr is unable to put aside his personal political views while carrying out his duties as Independent Counsel." *Id.* (citing to letters of Michael E. Shaheen, Jr., dated Feb. 7, Feb. 24 and May 6, 1997). The Court noted that "these conclusions speak for themselves," regardless of the standard of review. *Id.* The Court also dismissed the allegations made by Mandanici in *Mandanici III*. *Id.* at 1162.[7]

---

**5.** Judge Moody had earlier recused himself from consideration of this matter. *Id.* at 1155.

**6.** Then Chief Judge Reasoner and Judge Howard concurred with Judge Wright's opinion. *Id.* at 1163. Judge Eisele concurred in part and dissented in part. Judges Wilson, Moody, Roy and Woods recused themselves and took no part in the opinion. *Id.* at 1165.

**7.** On June 19, 1997, Mandanici filed a third letter grievance against Kenneth Starr ("Mandanici III"), alleging that the OIC improperly leaked grand jury information about Susan McDougal and Hillary Clinton. This allegation was based on a June 1, 1997 article in

Mandanici appealed the district court's dismissal. On June 23, 1998, the Eighth Circuit dismissed Mandanici's appeal, holding that Mandanici had no standing "to pursue his grievance in the district courts of the circuit beyond informing those courts of alleged misconduct, and no standing to appeal." *Starr v. Mandanici,* 152 F.3d 741, 751 (8th Cir.1998). The three circuit judges on the panel each wrote separate opinions. Judge McMillian held that Mandanici lacked standing but noted his belief that the district judges erred in finding that Rule V(A) of the Model Federal Rules of Disciplinary Enforcement was discretionary. Judge McMillian explained that the Rule should be interpreted as providing a mandatory duty to appoint counsel to investigate. *Id.* at 745 n. 12. Further, Judge McMillian "[took] issue with the weight that the district court accorded to both the DOJ's letter and Mandanici's alleged personal or political animus in filing the underlying complaints...." *Id.* at 746 n. 15. Finally, Judge McMillian stated his belief that the judges erred in requiring specific evidence of misconduct to establish an appearance of misconduct under Rule V(A) and felt that the judges should have reached the merits of Mandanici's underlying allegations. *Id.* Judge Beam concurred in part with Judge McMillian's opinion. Judge Beam agreed that Mandanici lacked standing to bring "either an initial action or an appeal." However, Judge Beam opined that the Eighth Circuit's analysis should stop there. *Id.* at 751. Judge Beam explained that "[i]f the district court 'decides not to proceed with the matter, the complainant has no recourse.'" *Id.* (quoting *Mattice v. Meyer,* 353 F.2d 316, 319 (8th Cir.1965)).

Judge Loken also agreed that Mandanici lacked standing but disagreed with Judge McMillian's discussion of the merits of Mandanici's allegations. *Id.* at 752. Judge Loken discussed the Independent Counsel Act and cited several historical

examples of the achievements of partisan prosecutors. Judge Loken noted that "[i]f independent counsel are to accomplish the purposes for which successive Congresses have created and consistently supported that Office, general allegations of partisanship, past political activity and future political ambition cannot be grounds to disqualify an independent counsel or to launch a distracting judicial investigation." *Id.* at 756.

## BACKGROUND OF MANDANICI'S CURRENT ALLEGATIONS

In Mandanici IV, Mandanici argues that the Court should appoint counsel to investigate whether Starr and his staff committed prosecutorial misconduct by "attempting to solicit false incriminating evidence against President Clinton," as indicated by defense witnesses during the 1999 trial of Susan McDougal. Mandanici IV at 3. Mandanici also refers the Court to a letter written by Sam Dash, Starr's former ethical advisor. *Id.* at 3, App. 71a (Dash's Nov. 20, 1998 letter to Starr). According to Mandanici, Dash's letter of resignation as Starr's ethical advisor suggests that Starr exceeded his duties under the Independent Counsel Act, 28 U.S.C. § 595(c), when Starr chose to testify at the hearing on impeachment before the House Judiciary Committee on November 19, 1998. *Id.* at 3, 32, App. 71a–72a, 76a (Statement of Starr before Committee on the Judiciary, U.S. House of Reps.).

Further, Mandanici asks the Court to note a third matter that is already under investigation in the United States District Court for the District of Columbia. *Id.* at 3. Chief Judge Norma Holloway Johnson held that certain news reports established a "prima facie case" that Starr and the OIC violated grand jury secrecy rules under Fed.R.Crim.P. 6(e)(2). *Id.* at 3, App. 1a (*In re Grand Jury Proceedings,* Misc. No. 98–228, 1998 U.S. Dist. LEXIS 17290 (D.D.C. Sept. 25, 1998)). Chief Judge Johnson therefore appointed a special

New York Times Magazine. *Id.* at 1160, 1162.

master "to collect and review evidence" and then submit the findings to the Court. *Id.* at App. 8a (*Grand Jury Proceedings,* 1998 U.S. Dist. LEXIS 17290, at \*33). Mandanici argues that this matter should be "used as grounds for the Court to reconsider the dismissal of [his] earlier grievance which was based in part on the Court's view that there was no other evidence of misconduct by Mr. Starr." *Id.* at 4.[8]

Mandanici also asks the Court to reconsider his previous letter grievances, which contained several allegations that Starr was laboring under conflicts of interest. These alleged conflicts included Starr's announcement that he intended to accept a deanship at the School of Public Policy at Pepperdine University in February 1997. *Id.* at 45; *see also Starr II,* 986 F.Supp. at 1168. The SPP is a school funded largely by the contributions of Richard Mellon Scaife, a supporter of conservative organizations and a Clinton opponent. Although the evidence presented by Mandanici concedes that Scaife and Starr had never met, Scaife played no part in the selection of Starr for the deanship and Starr never accepted the deanship, Mandanici nonetheless alleges that Starr's relationship with SPP or any conservative organization funded by Scaife constitutes a direct conflict of interest.

Additionally, Mandanici contends that Starr suffered a conflict of interest when he investigated the RTC in connection with the Whitewater affair at the same time that RTC was engaged in a lawsuit with Starr's law firm, Kirkland & Ellis. *Id.* at 52. Finally, Mandanici argues that Starr labored under a conflict of interest when he represented tobacco companies while he was working as the Independent Counsel. *Id.* at 49. Mandanici contends that the tobacco industry's ties with the Republican party were sufficient to create an appearance of impropriety for Starr. *Id.* at 50–51. Mandanici contends that Starr and his staff acted improperly in each of the above instances and asks the Court to appoint counsel to investigate all of these matters.

### STANDING

■ Initially, the Court will address the question of whether Mandanici has standing to bring this grievance. Mandanici asserts that he has standing to bring an ethical grievance against Starr, pursuant to Rule V(A) of the Model Federal Rules of Disciplinary Enforcement and Rule 8.3 of the Arkansas Rules of Professional Conduct. Mandanici IV at 6. With regard to the previous three Mandanici letter grievances, the Eighth Circuit held that a citizen has standing to bring a Rule V(A) ethics grievance to the attention of the Court, but the citizen's participation in the investigation stops there. *Starr v. Mandanici,* 152 F.3d at 748, 750–51.[9] Judge McMillian explained that Rule V(A) does not "elevate[ ] Mandanici's status above that of an informant." *Id.* at 751.[10] Judge

---

**8.** Mandanici makes a similar request regarding a current DOJ investigation in which Attorney General Reno is attempting to determine whether Starr "gave false statements to the Justice Department in order to obtain expansion of his jurisdiction to cover the Monica Lewinsky matter." Mandanici IV at 5, 42–43. Like the matter before Chief Judge Johnson, there is no need for this Court to use the DOJ's investigation as support for considering Mandanici's present grievances.

**9.** Mandanici concedes this limited role, stating, "My standing to file this present complaint is in accord with the Eighth Circuit's ruling that a citizen or lawyer has the 'standing to complain or inform the court of alleged

misconduct.' [*Mandanici,* 152 F.3d at 748]. It is conceded, however, that once I file this complaint, I then lack formal standing to obtain any relief." Mandanici IV at 6.

**10.** The Seventh Circuit issued a similar ruling. In *In re Continental Steel Corp.,* No. 91–3387, 1992 WL 133897, at \* 1 (7th Cir. June 17, 1992), the bankruptcy court declined to refer the appellants' grievance report to the Indiana Disciplinary Commission of the Indiana Supreme Court pursuant to Rule V(A) of the Rules of Disciplinary Enforcement for the Southern District of Indiana, finding no fraudulent behavior. The district court determined that the bankruptcy court's findings were not clearly erroneous. On appeal, the

Beam further explained that "if [Mandanici's] letters were simply treated as disciplinary grievances, then the district court had inherent power to consider the substantive allegations contained therein. Otherwise, if they were treated as complaints filed by Mr. Mandanici as a party to the action, the district court had no jurisdiction to consider the merits." *Id.* (citations omitted). Judge Beam further noted:

> A person who files an ethics grievance concerning a particular attorney does nothing more than "suppl[y] information for the court's consideration." He does not thereby "initiate an action." If the district court "decides not to proceed with the matter, the complainant has no recourse." Therefore, Mr. Mandanici's current effort before this court must be construed as an attempt to invoke our Article III jurisdiction to seek review of an unappealable event.

*Id.* (citations omitted).

This rule has been articulated in prior Eighth Circuit cases. In *Eaton v. Gerdes,* the Eighth Circuit held that an informant seeking sanctions against his former attorney " 'merely supplied information for the court's consideration' " and "lacked standing to appeal the District Court's decision not to discipline the attorney." *Eaton v. Gerdes,* No. 97–2326, 1997 WL 572151, at *1 (8th Cir. Sept.16, 1997) (per curiam) (citing *Mattice v. Meyer,* 353 F.2d 316, 319 (8th Cir.1965)). Other circuits have also

applied this rule in different situations. *See Ramos Colon v. United States Attorney for the Dist. of P.R.,* 576 F.2d 1, 2, 6, 9 (1st Cir.1978) (A former defendant "cannot challenge the court's decision not to discipline.... It remains for the court to vindicate its authority, if it so chooses."); *see also Application of Phillips,* 510 F.2d 126, 126 (2d Cir.1975) (per curiam) (pro se litigant in previous matter could not compel court to sanction opposing counsel because "a private person ... has no standing to participate in a disciplinary proceeding"). Accordingly, the Court holds that Mandanici may bring his allegations of misconduct to this Court's attention, but his involvement ceases at that point.

### INTERPRETATION OF RULE V(A)

 Before proceeding on the merits of Mandanici's allegations, the Court must first determine whether Rule V(A) of the Model Federal Rules of Disciplinary Enforcement creates a mandatory duty to refer any allegation of misconduct to counsel for investigation or whether the Rule provides the Court with some discretion to determine whether a referral is required.[11] Initially, the judges of the Eastern District of Arkansas differed in their analysis of the Rule. Ultimately, however, the Eastern District of Arkansas judges unanimously determined that under Rule V(A), the judges of the court had discretion in determining whether to refer a grievance to

---

Seventh Circuit held that appellants lacked standing to appeal. The court wrote:

> [b]y bringing their Report to the bankruptcy court, the appellants did not initiate a lawsuit or become parties to a disciplinary proceeding but simply served as informants to the court.... *Even if the reporting person is a party or counsel to a party in the case where the ethical violation has occurred,* the role of a party or counsel ends after a report has been submitted to the court. "It remains for the court to vindicate its authority."

*Id.* at *2 (citations omitted) (emphasis added).

**11.** The Court has adopted the Model Federal Rules of Disciplinary Enforcement and the

Model Rules of Professional Conduct. *Starr v. Mandanici,* 152 F.3d at 742 n. 1. Mod.Fed. R.Disc.Enf. V(A) provides that:

> When misconduct or allegations of misconduct which, if substantiated, would warrant discipline on the part of an attorney admitted to practice before this Court shall come to the attention of a Judge of this Court, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these Rules, the Judge shall refer the matter to counsel for investigation and the prosecution of a formal disciplinary proceeding or the formulation of such other recommendation as may be appropriate.

Mod.Fed.R.Disc.Enf. V(A).

counsel for investigation.[12] *Starr I*, 986 F.Supp. at 1156. This Court agrees that Rule V(A) is not ministerial. Rather, the Court finds that it is permitted—indeed required—to exercise discretion in determining if referral is necessary.

The language of Rule V(A) supports an interpretation that allows discretion in making referrals. This Court finds that the language of the Rule, which begins "When misconduct or allegations of misconduct which, *if substantiated,* would warrant discipline on the part of an attorney," *requires* the judge to make two preliminary determinations prior to making a referral. Initially, the judge must determine whether there is substantiated evidence of misconduct or substantiated allegations of misconduct. If so, the judge must determine whether a fuller investigation of the conduct or allegation would reveal that discipline is warranted. If both questions are answered affirmatively, the Court then refers the matter to counsel for investigation.[13]

The application of the canons of statutory construction to the Rule supports this Court's analysis. Under any other interpretation, the phrase "if substantiated," would be superfluous. It goes without saying that counsel appointed to investigate would have to substantiate allegations of misconduct before presenting findings to the Court. There is no reason to spell that out in the Rule. Consequently, the inclusion of the phrase "if substantiated" must mean something else. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (articulating "a reluctance to treat statutory terms as surplusage"). It seems more reasonable to interpret the phrase as modifying "allegations of misconduct," meaning that the allegations must be substantiated before counsel is appointed. This interpretation permits judges to exercise their discretion in evaluating the credibility of the allegation, thereby providing a safeguard against the appointment of counsel to investigate baseless allegations founded on rumor, innuendo, prejudice or emotion.[14]

Without the requirement of specific evidence, the Court would be required to appoint counsel to investigate any allegation of an appearance of impropriety,[15] creating the distinct likelihood of lengthy, costly and embarrassing ethical investigations that turn out to be totally without

---

**12.** In separate opinions, all of the judges in the Eastern District (except for Judge Moody who recused himself from the beginning) have agreed that this Court should be given reasonable discretion to determine whether to refer a grievance to counsel for investigation. *See* May 30, 1997 Mem.Op. at 9–10; *Starr I,* 986 F.Supp. at 1156.

**13.** Actually, there is a third element which the Court must consider before appointing counsel to investigate an allegation of misconduct and that is whether "the applicable procedure is not otherwise mandated by these Rules...." There is no evidence that the procedure that the Court should follow is otherwise mandated by these Rules.

**14.** That possibility is reinforced by the presence of the comma after "substantiated," setting the two phrases apart from the rest of the Rule. The commas both before and after the phrase "if substantiated" suggest that the sentence could read without that phrase. The insertion of that phrase must indicate an additional requirement. Otherwise, the Rule would be the same if the phrase were left out completely: "When misconduct or allegations of misconduct which would warrant discipline on the part of an attorney...."

**15.** Judge Loken addressed this issue specifically with regard to an Independent Counsel:

The question, then, is whether the judiciary should interfere in this process in the manner suggested by Judge McMillian and Judge Eisele, mounting judicial investigations of independent counsel whenever a citizen identifies an apparent political conflict of interest. In my view, the answer is a resounding no ... If judges undertake to 'investigate the investigators,' using vague standards such as apparent conflict of interest, it will inevitably politicize the judiciary and weaken legitimate efforts to weed out misconduct.

*Starr v. Mandanici,* 152 F.3d 741, 755–56 (8th Cir.1998) (Loken, J., concurring).

merit. The only difference between this interpretation and the requirement that all grievances be automatically referred is the artfulness of the informant's pleading.[16] There is no question that this interpretation would create a new tool, over and above 28 U.S.C. §§ 2254 and 2255 for virtually every criminal defendant found guilty and conceivably for many of those acquitted. Unlike the party to a civil action, a person who files an ethics grievance has no standing as a party, and the mere allegation of misconduct does not need to be accepted as true. The initiation of a disciplinary investigation against a lawyer is a serious matter that should not be initiated by the Court based on innuendo or rumor. Requiring a citizen to substantiate an allegation of misconduct protects the courts and the Bar from the disruption caused by investigations of a frivolous nature.[17]

▇ Accordingly, the Court finds that it is not compelled to refer this matter automatically to counsel for investigation. In deciding whether to refer an allegation of impropriety to counsel for investigation, the Court must consider the nature of the allegation, any facts or other information supplied by the informant that would substantiate the allegation and the likelihood that the facts alleged and substantiated would lead to disciplinary action. The informant herein has certainly had ample opportunity to substantiate his allegations, having filed hundreds of pages of documents, along with his memoranda, to support his position.

## ANALYSIS

Despite the fact that Mr. Mandanici's status is solely that of an informant and that once he brings his allegations to this Court's attention his part in the matter is ended, and the further finding that Rule V(A) provides this Court with the discretion to appoint counsel to investigate, this Court will nevertheless proceed to analyze the Mandanici allegations.[18] Hopefully, the following analysis answers the questions raised by grievant Mandanici and puts them to rest.

1. *Allegations of Solicitation of False Testimony*

▇ Mandanici first contends that misconduct by Starr and his staff was revealed during the 1999 trial of Susan McDougal. Mandanici IV at 14. During that trial, Judge Howard allowed defense witnesses to testify about allegations that Starr and his staff attempted to solicit false testimony that would be incriminating to President Clinton. *Id.* at App. 11a (*A Gain for McDougal in Her Contempt Trial*, N.Y. TIMES, Mar. 31, 1999, at A18 ("The judge in Susan H. McDougal's criminal contempt trial decided today to permit testimony from a Virginia woman [Julie Hiatt Steele] who says Kenneth W. Starr

16. An artful pleader could transform any trivial matter into an appearance of impropriety allegation.

17. Indeed, although the Court has specifically found that Mandanici has made no allegations of misconduct which, if substantiated, would warrant discipline by this Court, it is interesting to speculate about the effect of a contrary opinion. If counsel were appointed to investigate the Office of Independent Counsel, would a team of lawyers and investigators delve yet again into the *Tucker* case? Both *McDougal* cases? The *Smith* case? The *Jones* case? All of the successful prosecutions of the OIC? Where would this end? Would we effectively venture into the impeachment proceedings? This Court finds no reason to

waste further time and money of the American people by acting on the unsupported, or clearly refuted (and at times, patently frivolous), opinions and inferences set forth by Mr. Mandanici.

18. This decision to proceed is supported by the Eighth Circuit's decision in *Mattice v. Meyer*, 353 F.2d 316, 319 (8th Cir.1965) ("Because of the serious implications of the allegations of the complaint which, if true, could militate against the right of respondent to remain a member of the bar of the United States District Court for the District of Nebraska, we have looked beyond the technical aspects of the situation to ascertain whether there is any factual support for the accusations.").

prosecuted her because she undercut the testimony of a Presidential accuser.")). Steele has filed a related grievance and has attached a transcript of her testimony in the McDougal trial. In this testimony, Steele contends that she thought she could avoid indictment by telling the OIC what they wanted to hear. *See In re: Julie Hiatt Steele v. Kenneth W. Starr,* Misc. No. 99–MC–162, Steele Grievance, App. A, at 2437 (Transcript of *United States v. Susan H. McDougal,* No. LR–CR–98–82 (E.D.Ark. Apr.2, 1999)).

Further, Mandanici relies on news reports which detail statements made by McDougal and Steele. Both McDougal and Steele told reporters that they believed that the OIC was pressuring them to lie under oath. Mandanici IV at App. 11a–28a (Spring 1999 articles from New York Times, The Nation, Hartford Courant). Mandanici also points out that McDougal was acquitted on the obstruction of justice count at her trial in April 1999. *Id.* at 17. Further, he notes that one of the jurors stated afterwards that "he was convinced that McDougal honestly believed that Starr's office wanted her to lie, and that she feared she would be charged with perjury if she did not falsely implicate Clinton in wrongdoing." *Id.* at 17, App. 26a (Paul Duggan, *McDougal: Acquittal is a Victory over Starr,* HARTFORD COURANT, Apr. 13, 1999).

While the Court notes that it may take judicial notice of news accounts, especially with regard to the appearance of impropriety,[19] none of the articles contained in Mandanici's appendix persuade the Court that it should appoint counsel to investigate this matter. Many of the articles are editorials or were written in publications that are historically partisan. If judges appointed counsel to investigate every allegation of ethical violations simply based on an editorial or a partisan article, any attorney in the public eye would be a potential target for investigation. Additionally, based on the Court's review, none of the articles detail any specific statement made by Starr or the OIC urging or attempting to coerce a witness to lie. Rather, the articles give accounts of McDougal's and Steele's subjective thoughts and responses.

The Court finds that the subjective opinions of witnesses (one of whom is a convicted felon and one of whom has admittedly made false statements), that they thought they could avoid legal problems if they testified falsely is insufficient to justify initiation of a disciplinary investigation of the prosecutor. It is doubtful that such question would even be asked if the prosecutor were anyone other than an Independent Counsel. Accepting as true for the sake of argument that McDougal and Steele thought that they could avoid further legal problems if they testified falsely, there is not one shred of support in the hundreds of pages of documents submitted by Mandanici to support these subjective opinions.

It is important to remember that not only are prosecutors allowed to be zealous in their positions, they have a duty to be zealous. *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 248, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) ("Prosecutors need not be entirely 'neutral and detached.' In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law.") (citations omitted).[20] In order to arrive at the truth, prosecutors are afforded a great deal of discretion. They decide

---

**19.** *See* May 30, 1997 Mem.Op. at 18 (citing *United States v. Tucker,* 78 F.3d 1313, 1322–23 (8th Cir.1996) for the proposition that print media has the power to affect public perception). This Court notes, however, that articles relied upon in the *Tucker* case contained direct quotes from Judge Woods himself-quite a different scenario than the instant case.

**20.** *See also Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (A prosecutor "may prosecute with earnestness and vigor-indeed he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.").

against whom to seek indictments, they choose who to interview, and they possess enormous investigative powers. Prosecutors are entitled to credit the testimony of one witness over another. Further, with regard to witnesses who change their stories, it is not unusual for a prosecutor to threaten prosecution against a person he deems to be lying.

The evidence is clear that the OIC was attempting to find the truth (as any prosecutor is entitled—indeed, required—to do) and believed that McDougal and Steele were lying. *See, e.g., United States v. Lovasco,* 431 U.S. 783, 795, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (holding that prosecutor may wait to seek indictment "until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt"); *United States v. Lacey,* 86 F.3d 956, 965 (10th Cir.1996) ("[T]he courts will not usurp the prosecutor's role in deciding when a particular case is strong enough to seek an indictment."); *United States v. Brown,* 959 F.2d 63, 66 (6th Cir.1992) (defendant has a "vital interest[ ] in freedom from indictment prior to a showing of probable cause consistent with the Fourth Amendment"). Thus, Mandanici has failed to provide any evidence that the OIC's decisions to indict McDougal and Steele were anything other than legitimate enforcement of the law.

Furthermore, it is clear that Starr's zealous prosecution was not baseless. The validation of Starr's efforts is evident in his record of fourteen convictions in complex, high profile cases as well as the adoption by the House of Representatives of Articles of Impeachment against the President. Further, the OIC prevailed in seventeen out of eighteen appeals in matters it was handling. A record this successful could not have been established on baseless evidence. The Court has carefully reviewed all of the evidence produced and finds that there is no support for the allegation that Starr or the OIC attempted to solicit false testimony.

### 2. *Letter of Sam Dash*

Mandanici also asks the Court to appoint counsel to investigate whether Starr violated the Independent Counsel Act when he testified before the House Judiciary Committee in November 1998. Mandanici IV at 3. Prior to testifying, Starr provided the House with a complete report on the findings of the OIC regarding impeachment proceedings against President Clinton. According to Starr, he was then invited to testify before Congress "to summarize and explain the substance of [the] referral and the process that went into it." *Id.* at App. 74a (Starr's Nov. 20, 1998 letter to Sam Dash). Dash informed Starr that he was resigning as Starr's outside consultant and advisor as a result of Starr's acceptance of the House Judiciary Committee's invitation to testify. Dash wrote, "[i]n doing this you have violated your obligations under the Independent Counsel statute and have unlawfully intruded on the power of impeachment which the Constitution gives solely to the House." *Id.* at App. 71a. Dash informed Starr that he went beyond his limited duty "to objectively provide for the House substantial and credible information that may constitute grounds for impeachment." *Id.* Mandanici alleges that Dash's letter is evidence of Starr's violation of the Independent Counsel Act and should be sufficient to compel the Court to appoint counsel to investigate this alleged violation. *Id.* at 3, 39.

Starr responded to Dash on the same day and stated that Dash's letter "reflects an inaccurate view of the law, as well as the events that unfolded yesterday." Mandanici IV at App. 74a. Starr opines:

> [b]ecause the statute requires a written referral of information that "may constitute grounds for an impeachment"—and you supported our referral—it seems to me that it cannot reasonably be a violation of law to personally appear before Congress, at its invitation, to summarize

and explain the substance of a referral and the process that went into it.

*Id.* Further, Starr explains, "Section 595(c) of the statute states, 'Nothing in this chapter ... shall prevent the Congress or either House thereof from obtaining information in the course of an impeachment proceeding.'" Thus, Starr writes, "an independent counsel can hardly cite the independent counsel statute as a basis for refusing to cooperate and appear before Congress in an impeachment proceeding, as you suggest we should have done." *Id.* Starr further stresses that he did not ask to appear before the Committee but was invited to do so, and no member of the Committee raised an objection to Starr's appearance. Finally, Starr counters Dash's allegation that "by appearing, [Starr] harmed public confidence in the independence of the Office." Instead, Starr asserts that "[a] refusal to appear would have suggested that we have something to hide, or that we are unwilling to defend and stand by the written referral." *Id.* at App. 75a.

The Court believes that this is a case where two very knowledgeable, well-respected attorneys simply differed in their interpretation of the law. This belief is underscored by a glance at the remainder of Dash's letter, the substance of which is notably absent from Mandanici's grievance. In the letter to Starr, Dash writes:

> My decision to leave has nothing whatsoever to do with the many unfounded and misinformed attacks on your conduct as Independent Counsel.... From my special vantage point, as an experienced professional outsider with no personal or professional stake in the outcome of your investigations, I found that you conducted yourself with integrity and professionalism as did your staff of experienced federal prosecutors.

*Id.* at App. 71a. Except for Starr's appearance at the pre-impeachment proceedings in the House, Dash endorses Starr's actions as Independent Counsel. As Starr's ethical advisor, Dash essentially placed his imprimatur on all of Starr's actions up to the date that Starr testified before the House in November 1998. By asserting that Mr. Dash is the controlling authority, Mandanici seems to be conceding that most of his allegations are without merit.

Sam Dash is obviously a very well-respected attorney, hired by Starr to advise him on ethical issues. It has not been established, however, that Dash is the final decision-maker with regard to the interpretation of the Independent Counsel statute, which has been the subject of much debate in recent years and throughout its history.[21] It certainly is not necessary for this Court to become involved in the fine distinctions drawn between these two highly regarded constitutional lawyers concerning their interpretation of the Independent Counsel Act. The suggestion that this difference of opinion should be the subject of an ethics investigation is ridiculous, especially when considered in light of Dash's otherwise staunch support of Starr's actions as Independent Counsel.

### 3. *Matter before Chief Judge Johnson*

Mandanici also asks the Court to note a matter currently before Chief Judge Nor-

**21.** *See Morrison v. Olson,* 487 U.S. 654, 696–97, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (upholding constitutionality of the Independent Counsel provisions in the Ethics in Government Act of 1978 against separation of powers challenge); *see also In re Madison Guaranty Savings & Loan Ass'n,* 187 F.3d 652, 653 (D.C.Cir.1999) (deciding not to terminate office of Independent Counsel); ROBERT B. FISKE, JR., TESTIMONY OF ROBERT B. FISKE, JR. HEARING ON INDEPENDENT COUNSEL ACT BEFORE UNITED STATES SENATE COMMITTEE ON GOVERNMENTAL AFFAIRS, WASHINGTON D.C., MARCH 3, 1999, 1999 WL 8086865 (detailing history of Independent Counsel statute). Additionally, many law review articles have been written on the subject. *See, e.g.,* Joseph S. Hall et al., *Independent Counsel Investigations,* 36 AM.CRIM. L.REV. 809 (1999); Thomas W. Merrill, *Beyond the Independent Counsel: Evaluating the Options,* 43 ST. LOUIS U.L.J. 1047 (1999); Julie O'Sullivan, *The Independent Counsel Statute: Bad Law, Bad Policy,* 33 AM.CRIM L.REV. 463 (1996); Joshua M. Perttula, *The Political Price of the Independent Counsel Law,* 25 HASTINGS CONST. L.Q. 257 (1998).

ma Holloway Johnson in Washington, D.C. In 1998, Chief Judge Johnson found a prima facie case that Starr and his staff improperly leaked grand jury information in violation of Fed.R.Crim.P. 6(e)(2). Mandanici IV at 3, App. 1a (*In re Grand Jury Proceedings*, Misc. No. 98–228, 1998 U.S.Dist. LEXIS 17290 (D.D.C. Sept. 25, 1998)). Subsequent to an appeal to the District of Columbia Circuit and the issuance of the Court of Appeals' opinion,[22] Chief Judge Johnson appointed a special master to investigate 24 news reports, each of which she found to be evidence of a "prima facie violation" by Starr or his staff. *Id.* at App. 8a (*Grand Jury Proceedings*, 1998 U.S.Dist. LEXIS 17290, at *33).

Mandanici does not ask this Court to duplicate the investigation taking place in the District of Columbia but only raises this issue to demonstrate that the Court should reconsider his earlier grievance because there is "other evidence of misconduct by Mr. Starr." Because this Court is analyzing all of Mandanici's allegations, this issue is denied as moot.

### 4. *Allegations of Conflicts of Interest*

#### a) *Pepperdine–Scaife*

■ Mandanici contends that Starr labored under a conflict of interest when he indicated he was accepting an offer in February 1997 to become dean of the School of Public Policy at Pepperdine University, even though Starr formally turned down the offer in April 1998. Mandanici IV at 45. For Mandanici, Starr's problem with accepting a deanship at Pepperdine has to do with Richard Mellon Scaife's contributions to the school. *Id.* Scaife has reportedly contributed "at least $340 million to conservative causes and institutions—

about $620 million in current dollars, adjusted for inflation." *Id.* at App. 150a (Robert G. Kaiser & Ira Chinoy, *How Scaife's Money Powered a Movement*, WASHINGTON POST, May 2, 1999, at A1). "According to various media reports, [Scaife also] has used his fortune to press a media campaign discrediting President Clinton and suggesting that Vincent Foster, Jr., may have been murdered." May 30, 1997 Mem.Op. at 19.

Scaife reportedly contributed over $1 million of the $3 million in start-up costs for the School of Public Policy at Pepperdine. Mandanici IV at 45. However, Mandanici concedes that there is no evidence that Scaife and Starr had ever met and no evidence that Scaife played a role in Starr's selection for the deanship. *Id.* at App. 151a.[23] Consequently, Mandanici's allegation of an appearance of conflict of interest stems merely from the existence of Scaife's contribution and Starr's acceptance of a deanship. In essence, Mandanici argues that "without that one-third contribution to start the school then Mr. Starr would never have had that opportunity to collect that salary." *Id.* at 45. The Court declines to appoint investigative counsel based solely on this very dubious assertion.

Merely because Starr intended at the time to accept a deanship with a school that had conservative backers does not suggest that he was incapable of carrying out his duties as Independent Counsel without bowing to the political desires of contributors whom he had never met. To adopt Mandanici's argument would prevent an Independent Counsel from accepting any future employment in academia, because most schools are financially supported by either liberal or conservative

---

**22.** *In re Sealed Case No. 98–3077*, 151 F.3d 1059, 1075–76 (D.C.Cir.1998).

**23.** The Washington Post reported, "Scaife and the current president of Pepperdine, David Davenport, both have said that Scaife played no role whatsoever in the offer to

Starr. Scaife and Starr have said they don't know each other, and have never met." Mandanici IV at App. 151a (Robert G. Kaiser & Ira Chinoy, *How Scaife's Money Powered a Movement*, WASHINGTON POST, May 2, 1999, at A1).

contributors, or both.[24] Mandanici also concedes that Starr ultimately decided to turn down the Pepperdine deanship in order to avoid possible problems. *Id.* at 45.[25] However, Mandanici argues:

> [b]ut that break from Mr. Scaife's financial strings may be difficult to maintain especially if Mr. Starr wants to associate himself with any conservative institution after he eventually resigns as independent counsel.... Assuming that Mr. Starr still espouses conservative causes such as those he would have advocated as dean of Pepperdine's School of Public Policy, it would be hard for Mr. Starr to find a position in conservative academia that Mr. Scaife has not touched as the "funding father" with his $620 million in contributions.

*Id.* at 46.

This is the stuff that dreams are made of. Mandanici seems to be arguing that in the future Starr is not allowed to take any job that has any connections with conservative organizations or Scaife. This Court has never heard a more absurd argument. Mandanici's rationale would prevent any Independent Counsel from having any political leanings at all. In fact, any prosecutor who left office and developed clients of conservative leanings (or liberal leanings, presumably) would almost necessarily violate this new theory of conflicts propounded by Mr. Mandanici. This Court does not believe that Congress intended such a consequence when enacting the Independent Counsel statute. *See* Judge Loken's concurrence in *Starr v. Mandanici,* 152 F.3d at 752–56.[26]

Further, if we accept for the sake of argument, Mandanici's claim that Scaife is out to "get" President Clinton and that Starr feels likewise, then why would Scaife want Starr to leave the position of Independent Counsel? It carries with it all the power regarding the various matters involved herein, including the possible criminal prosecution of the President after he leaves office. The idea that Scaife would want to lure Starr away from such a powerful position seems totally illogical. It is also interesting to note that Starr reportedly believed that Scaife was not a supporter of Starr's investigation because Scaife felt that the OIC was not vigilant enough in its investigation of President Clinton.[27]

The Court finds that there is no evidence that Starr's consideration of the de-

---

24. No doubt, many in academia would have trouble accepting Mandanici's assertion that a deanship is so desirable a position that a man who was a partner in a major national law firm, an Independent Counsel appointed to investigate the President, a former federal circuit judge and a former Solicitor General lacked the credentials to become a dean without "selling out" his credibility to one of the school's financial contributors.

25. Seven months after the much publicized Pepperdine controversy, Starr's ethical advisor Sam Dash, a former Independent Counsel, Democrat and an authority relied upon by Mandanici, specifically stated in his November 1998 letter to Starr, that the many attacks on Starr's conduct as Independent Counsel were "unfounded and misinformed" and that he had conducted himself "with integrity and professionalism." Mandanici IV at App. 71a.

26. Judge Loken wrote:
 History's message is clear-investigating misconduct by those in high office is bruising political work. That message is confirmed by our more recent experience under the Independent Counsel Act. Targets from both political parties have invariably decided that the best way "to blunt political damage posed by an investigation is to attack as biased the [Independent Counsel], or the judges that appointed him."
 *Id.* at 755 (alteration in original). This Court notes that Judge Loken's words are even more relevant when one recalls that Mandanici also attempted to bring an ethics complaint against Judge Sentelle, a member of the Special Division that appointed Starr. *See* May 30, 1997 Mem.Op. at 2.

27. *See* Eric Pooley & Michael Weisskopf, *How Starr Sees It–Probing the Prosecutor,* Time Magazine, Dec. 28, 1998, at 82, *available in* 1998 WL 25187468 (reporting that Starr "saw Scaife as one of his own harshest critics because Scaife's minions had attacked a Starr report concluding that Vince Foster killed himself").

anship at Pepperdine or any potential future relationship with any other Scaife-funded conservative cause affected his performance as Independent Counsel or created an appearance of a conflict of interest. For these reasons, the Court will not appoint counsel to investigate this matter.

### b) *Resolution Trust Corporation*

■ Mandanici's second appearance of conflict allegation involves Starr's investigation of the RTC. Mandanici contends that Starr labored under a conflict of interest by " 'refus[ing] to disqualify himself from decisions involving the Resolution Trust Corporation, an important agency in Whitewater matters, after being notified that the [RTC] had sued [Mr. Starr's own law firm] Kirkland & Ellis.' " Mandanici IV at 52, 166a (quoting from App. 166a: Editorial, *Mr. Starr's Conflicts*, N.Y. TIMES, Mar. 31, 1996, at 14E) (alteration in original). Starr investigated the RTC regarding its supervision of Madison Guaranty, a player in the Whitewater incident. *Id.* at App. 162a (Jane Mayer, *How Independent is the Counsel?*, NEW YORKER, Apr. 22, 1996). The lawsuit between RTC and Kirkland & Ellis was filed in May 1993. *Id.* at App. 170a (Joe Conason & Murray Waas, *Troubled Whitewater: The Dual Roles of Kenneth W. Starr*, THE NATION, Mar. 18, 1996, at 14). RTC accused Kirkland & Ellis of " 'aiding and abetting breaches of fiduciary responsibility' at a Colorado thrift, the First America Savings Bank." *Id.* The parties eventually settled the case for $325,000.00 in January 1996. *Id.* at App. 173a.

Mandanici cites an article which alleges that "some of the same officials whose conduct Starr [ ] investigat[ed] were involved in the decision to sue his law firm." *Id.* at App. 170a. Although, as Michael Shaheen of the DOJ noted, this may be tantamount to "a technical conflict of inter-

est" because Starr was a senior partner at Kirkland & Ellis and has acted on its management committee, there is no indication that Starr had any connection with the RTC lawsuit. In fact, one of Mandanici's cited news editorials concedes that "Mr. Starr was not involved in the negotiations and did not know about the suit at the time he was appointed as Whitewater counsel." *Id.* at App. 166a (Editorial, *Mr. Starr's Conflicts*, N.Y. TIMES, Mar. 31, 1996, at 14E). Further, Mandanici brings forth no evidence that the presence of this lawsuit affected Starr's ability to carry out his duties as Independent Counsel. In fact, Mandanici includes an article in his appendix which reports that when Starr learned of the lawsuit between RTC and Kirkland & Ellis, "he offered to recuse himself from any dealings with the [RTC], something that [his ethical advisor] Dash deemed unnecessary." *Id.* at App. 162a (Jane Mayer, *How Independent is the Counsel?*, NEW YORKER, Apr. 22, 1996).[28]

The now-defunct RTC sued a great number of law firms in connection with the failed savings and loan crisis. Indeed, the Court notes that it would have been difficult for a large law firm practicing banking law, such as Kirkland & Ellis, to avoid some involvement with the RTC during this period. Thus, it is unrealistic to suggest that Starr unknowingly labored under a conflict of interest simply because his very large law firm was engaged in litigation with this very large organization. Additionally, even though the Court acknowledges that it is not bound by the findings of the DOJ investigation due to the DOJ's stricter standards for investigation, the Court finds it persuasive that the DOJ found " 'no information to support the proposition that such a conflict, if in fact it ever actually existed, substantially impair[ed] Judge Starr's current ability to carry out the duties of his office.' " May 30,

---

**28.** Another included editorial notes, "Mr. Starr's ethics counsel, Sam Dash ... says there is no need for Mr. Starr to distance himself from aspects of Whitewater involving the [RTC]." *Id.* at App. 166a (Editorial, *Mr. Starr's Conflicts*, N.Y. TIMES, Mar. 31, 1996, at 14E). The Court notes that this article was included by Mr. Mandanici.

1997 Mem.Op. at 3–4.[29] If the DOJ determined that Starr committed a violation of 28 U.S.C. § 594(j),[30] it surely would have investigated the matter further. Contrary to Mandanici's assertion, the evidence he presents clearly indicates that there was no suggestion of bias or conflict in Starr's handling of the matter involving the RTC. There is no reason to appoint counsel to investigate this matter.

### c) *Ties to the Tobacco Industry*

██ Finally, Mandanici contends that Starr suffered a conflict of interest because of his alleged ties to the tobacco industry. Mandanici IV at 50. While acting as Independent Counsel, Starr remained a partner at Kirkland & Ellis. On behalf of Kirkland & Ellis, Starr represented two tobacco companies, Brown & Williamson and Phillip Morris. *Id.* at App. 161a (Jane Mayer, *How Independent is the Counsel?*, NEW YORKER, Apr. 22, 1996). According to an article cited in Mandanici's appendix, "Starr [ ] has been the counsel of record, representing cigarette manufacturers in the appeal of a ruling permitting millions of American smokers to join in a potentially ruinous class action suit." *Id.* A Wall Street Journal article reported that the appeal "involve[d] arcane legal issues," and noted that "in his briefs Mr. Starr attack[ed] the notion that nicotine is uniformly addictive, although he doesn't deny its addictive potential." *Id.* at App. 165a (Glenn R. Simpson, *Starr's Legal Work for Tobacco Industry, Others Raises Eyebrows over Independent Counsel Role*, WALL ST.J., Mar. 27, 1996).

Mandanici contends that Starr's representation was improper in light of the tobacco industry's alleged ties with the Republican party and the industry's "campaign to get Clinton." *Id.* at 50.

In reference to President Clinton's impeachment, Mandanici argues that "[n]othing would please the tobacco companies more than for Mr. Starr to weaken, if not remove from office, an enemy who just might have as much clout as the tobacco companies." *Id.* at 51. He points out that the Wall Street Journal reported that Sam Dash believed that Starr's representation of private clients while investigating Clinton "ha[d] an odor to it." *Id.* at 50, App. 157a (Jane Mayer, *How Independent is the Counsel?*, NEW YORKER, Apr. 22, 1996). Mandanici alleges that there was "the rather tawdry appearance that Mr. Starr not only consciously tailored his prosecutorial discretion but abused his power to please the tobacco companies which were paying him large sums of money in attorney fees." *Id.* at 51.

The Court finds this allegation to be nonsense. There is no indication that Starr tailored his work as Independent Counsel in an attempt "to please the tobacco companies." Further, there is no evidence that the tobacco companies represented by Starr attempted to influence his investigation. Even assuming that the heads of the tobacco companies are totally Republican (an assumption which the Court finds absolutely ridiculous), they are entitled to hold their own political beliefs, as is an Independent Counsel (and as is one who brings grievances before this Court). The Court, however, rejects the inference, absent any specific evidence, that political beliefs caused the representatives of Brown & Williamson or Phillip Morris to attempt in any manner to influence Starr's investigation or that those political beliefs caused Starr to tailor his investigation "to please" an outside party. In this country, tobacco companies, like

---

29. Consequently, Judge Eisele explained that "[i]n light of the Justice Department's response regarding the older RTC allegations, the Court no longer finds any reason to address the RTC allegations." May 30, 1997 Mem.Op. at 5.

30. 28 U.S.C. § 594(j) details the standards of conduct applicable to the Independent Counsel.

other persons or businesses, are entitled to legal representation. Likewise under the Independent Counsel law, Starr was entitled to practice law, representing private clients.

An article in Mandanici's appendix notes that "the independent counsel law was drawn to encourage part-time appointees in order to attract top-flight lawyers who don't want to give up their practices." *Id.* at App. 165a (Glenn R. Simpson, *Starr's Legal Work for Tobacco Industry, Others Raises Eyebrows over Independent Counsel Role,* WALL ST.J., Mar. 27, 1996); *see also* 28 U.S.C. § 594(j) (articulating restrictions placed on Independent Counsels and their law firms vis-a-vis clients). Further, although Mandanici noted part of Dash's statement with regard to Starr's decision to continue representing private clients, Mandanici failed to note the portion of the article that stated that Dash felt that "[w]hat [Starr is] doing is proper." *Id.* at App. 157a (Jane Mayer, *How Independent is the Counsel?,* NEW YORKER, Apr. 22, 1996). Further, Dash stated that, "Starr's decision to continue representing private clients while investigating the President violates neither professional ethics as they are narrowly defined for legal purposes, nor the law that specifies the duties of an independent counsel." *Id.* Another article included in Mandanici's appendix reports that "Sam Dash, whom Mr. Starr hired as an ethics counselor, says none of Mr. Starr's activities pose a conflict of interest." *Id.* at App. 165a (Glenn R. Simpson, *Starr's Legal Work for Tobacco Industry, Others Raises Eyebrows over Independent Counsel Role,* WALL ST.J., Mar. 27, 1996).[31] Those statements suggest that appointment of counsel to investigate this matter would be unnecessary and improvident.

Mr. Mandanici's main quarrel would seem to be with Congress in permitting an Independent Counsel to retain his or her private law practice. Part of this question has since been resolved, of course, by the recent Congress in allowing the Independent Counsel statute to expire. Clearly, the Court is obliged to decline to appoint counsel to investigate the tobacco matter.

## A FINAL MATTER

At the time this matter was assigned to this writer, the parties were informed that the assignment of the matter and all issues related to it would remain under seal until further order of this Court. Even though he is appearing pro se, Mr. Mandanici is an attorney and knows the meaning of these words. Mr. Mandanici was obviously the source of a news report that appeared in a Connecticut paper indicating that this Court had accepted assignment of the matter and indicated that Mandanici "has a case." *See* Thomas Scheffey, *Catch a Falling Starr?,* CONNECTICUT LAW TRIBUNE, Feb. 22, 2000. This interview and leak was a violation of this Court's Order and was false. Another improper disclosure resulted in an article in an Arkansas

---

**31.** Notably, this article also reports that "Mr. Dash, a liberal Democrat, also says Mr. Starr has gone to great lengths to be fair in his investigation and has created an elaborate process to guard against any bias creeping into decision making." Mandanici IV at App. 165a. This sentiment was also noted in another article in Mandanici's appendix:

Starr has taken steps to assure the public of his evenhandedness. In addition to hiring Dash, ... he also chose a Democrat to oversee the highly sensitive Washington end of his investigation: Mark Tuohey, a former president of the District of Columbia Bar Association. (In addition, Tuohey, unlike Starr—but like many of Starr's hires—had experience as a prosecutor.) Tuohey has since left the investigation but he continues to admire Starr, about whom he says, "I was convinced he wasn't going to play it politically; otherwise, I wouldn't have gotten involved." He says Starr has set up an elaborate system in the office to insure that all major decisions are made by consensus, "in order to avoid mistakes." And he argues that so far the results have validated the investigation. "With eight indictments and nine pleas, clearly it has been merited. Clearly there's been conduct which has been criminal."

*Id.* at App. 161a–162a (Jane Mayer, *How Independent is the Counsel?,* NEW YORKER, Apr. 22, 1996).

paper. *See* Linda Satter, *Judge Named to Handle Grievances Against Starr*, ARKANSAS DEMOCRAT-GAZETTE, February 9, 2000.

In addition, Mandanici submitted a copy of a letter in this matter to a person who clearly should not have received such copy. This conduct constitutes three direct violations of this Court's Order. Unlike the inferences and assumptions that formed the basis of Mandanici's complaints about Starr's conduct, Mandanici's three known violations of this Court's Order merit serious consideration of both discipline and sanctions, matters that this Court may consider at a later date.

### CONCLUSION

For the foregoing reasons and in the exercise of its discretion, the Court declines to appoint counsel to investigate the matters set forth in Mandanici IV.